328 S.E.2d 164

**PRINCETON COMMUNITY HOSPITAL**

v.

**STATE HEALTH PLANNING, etc.**

**BLUEFIELD COMMUNITY HOSPITAL**

v.

**STATE HEALTH PLANNING, etc.**

**No. 16353.**

Supreme Court of Appeals of West Virginia.

March 22, 1985.

---

Charles G. Brown, Charleston, for Blue Cross.

Robert E. Holroyd, Princeton, for Princeton Community Hosp.

Guy W. Perkins and Debra Archer, Katz, Kantor & Perkins, Bluefield, for Bluefield Community Hosp.

J. Bradley Russell, Asst. Atty. Gen., Charleston, for State Health Planning, etc.

McGRAW, Justice:

This is an appeal from the judgment of the Circuit Court of Mercer County which granted certificates of need to the appellees, Bluefield Community Hospital, Inc. and Princeton Community Hospital Association, Inc. Prior to the circuit court's decision, these certificates of need had been denied by both appellants, the State Health Planning and Development Agency and the State Tax Department, the agency charged with administrative review of certificate of need determinations. The appellants, assigning several points of error to the circuit court's final determination, seek reversal of that court's judgment and affirmation of the underlying agency and administrative review decisions.

I

Bluefield Community Hospital is a 265-bed hospital located in Bluefield, Mercer County. It is owned and operated by the Bluefield Community Hospital, Inc. (hereafter BCH), a private, nonprofit corporation. The facility housing Bluefield Community Hospital was built in 1979. Citing a number of factors, including the addition of several new medical services, increased patient loads, growth of the medical staff, and design deficiencies in the hospital's physical plant which exacerbate the resulting space shortages, BCH proposed a construction and renovation project for the facility. Pursuant to the requirements of West Virginia Code § 16–2D–1 *et seq.* (1979 Replacement Vol. & Supp.1984), BCH, on April 8, 1982, submitted a certificate of need application to the State Health Planning and Development Agency (hereafter SHPDA) seeking approval for a construction and renovation program involving the addition of fifty general acute care beds as well as the relocation and expansion of ancillary and support services. The total project cost was estimated to be approximately 12 million dollars.

The Princeton Community Hospital Association, Inc. (hereafter PCH) owns and operates the Princeton Community Hospital, a 215-bed facility located in Princeton, also in Mercer County. On June 17, 1982, PCH also submitted an application for a certificate of need from SHPDA. PCH sought approval for a construction and renovation project which would involve the addition of sixty-eight medical/surgical, pediatric, and psychiatric acute care beds, as well as an addition of thirteen substance abuse beds. Total cost of this project was set at approximately 4.5 million dollars.

Both applicants were proposing additional acute care beds which were potentially duplicative. Therefore, to facilitate a proper determination of the comparative and cumulative effects of these proposals, SHPDA consolidated the review of these two applications.[1] On September 28, 1982, SHPDA received a request from Blue Cross/Blue Shield of Southern West Virginia, Inc., for public hearings concerning these applications. In accordance with West Virginia Code § 16–2D–7(n) (Supp. 1984), this request was granted and hearings were held in November of 1982. Blue Cross, a third-party payer of health care costs, was designated an "affected person" under West Virginia Code § 16–2D–2(a)(8) (Supp.1984) and subsequently participated

---

**1.** West Virginia Board of Health Legislative Rules, Ch. 16–2D (Series I) § 16.01(e) (1983) provides that:

In considering applications in relation to each other, the State Agency shall consider the extent to which proposed new institutional health services within each batching category that are in the same review cycle are potentially unnecessarily duplicative of each other, and where the potential for such unnecessary duplication exists, the State Agency shall conduct its review of such applications so as to compare the potentially unnecessary duplicative portions of the applications, and if one or more of the applicants are granted a Certificate of Need, the comparative analysis shall be included in the decision or decisions. The determination that applications are potentially unnecessary duplicative shall be made before the review cycle begins.

as an interested party throughout various stages of the review process.[2]

On January 25, 1983, SHPDA denied the BCH and PCH certificate of need applications as being inconsistent with the State Health Plan. Following the denial of their applications, both BCH and PCH appealed to the designated review agency, the State Tax Department. Pursuant to the requirements of West Virginia Code § 16–2D–10 (Supp.1984), the review agency conducted a hearing in this matter and reviewed the record in light of the errors alleged by BCH and PCH regarding the denial of their applications by SHPDA. Upon examination of the record and the issues raised, the Tax Commissioner, on June 13, 1983, affirmed the decision of SHPDA denying both certificate of need applications.

Both applicants appealed the decision of the Tax Commissioner to the Circuit Court of Mercer County. On January 27, 1984, Circuit Judge William O. Bivens reversed the decisions of both SHPDA and the State Tax Commissioner and entered an order granting both certificates of need.

## II

■ As part of the comprehensive and ongoing effort to address the national problem of spiraling health care costs, Congress, in 1975, enacted the National Health Planning and Resources Development Act.[3] The Act encourages the establishment and integration of federal, state and local health planning administration. The primary focus of this legislation is to avoid the cost-inflating effects caused by overbedding and unrestrained acquisition of high-priced diagnostic equipment.[4] To combat the patterns of maldistribution in health care facilities and services, the fruits of the planning efforts under the Act are utilized by federal and state agencies to determine appropriateness of institutional health care proposals to ensure that only those additions actually needed in an area will be provided.

Each state develops its own detailed State Health Plan, drawing from a broad range of input sources. See 42 U.S.C. § 300m–3(c) (1982). Although state participation is not "required" by the Act, states not choosing to do so face significant losses in federal funding in health-related programs. See 42 U.S.C. § 300m(d) (1982). A major part of the expected role of each state is the establishment and administration of a review program to evaluate health institution proposals to avoid unnecessary and costly duplication of hospital beds and services in a particular area. See 42 U.S.C. § 300m–2(a)(4) (1982); see also 42 U.S.C. § 1320a–1 (1982).

In 1977, the West Virginia Legislature responded by enacting certificate of need legislation which satisfies the minimum requirements of the federal act. See West Virginia Code §§ 16–2D–1 et seq. (1979 Replacement Vol. & Supp.1984).[5] It is within the procedural and substantive context of these federal and state acts that the appellants now seek reversal of the grant of certificates of need to BCH and PCH by the Circuit Court of Mercer County.

2. In a related action, Blue Cross, on November 22, 1982, obtained a temporary injunction from the Circuit Court of Kanawha County. The injunction prohibited SHPDA from considering certificate of need applications until the final approval of the State Health Plan. On December 8, 1982, the injunction was modified to allow review of the applications as long as no certificates of need were issued. One week later the State Health Plan was finally approved and adopted, and on January 10, 1983, the injunction suit was dismissed without prejudice. *Blue Cross v. Hansbarger,* Civ.Act. No. 82–4925 (Cir.Ct. Kanawha Co. Jan. 10, 1983).

3. Pub.L. No. 93–641, 88 Stat. 2225. This act has experienced minor changes from time to time, along with substantial amendment occurring in October of 1979 by the Health Planning and Resources Development Amendments, Pub.L. No. 96–79, 93 Stat. 592. The Act is codified at 42 U.S.C. §§ 300k et seq. (1982).

4. *See generally* Shan and Roemer, *Hospital Costs Relate to the Supply of Beds,* 92 Modern Hospital 71 (1959); Schramm, *A State-Based Approach to Hospital-Cost Containment,* 18 Harv.J. on Legis. 603 (1981). See also 42 C.F.R. § 121.201 (1983).

5. *See also* West Virginia Code § 16–29B–1 et seq. (Supp.1984). This article affects certificate of need proceedings begun after July 1, 1984. *See* West Virginia Code § 16–29B–11 (Supp.1984).

■ Administrative and judicial review of certificate of need decisions made by SHPDA is controlled by West Virginia Code § 16–2D–10 (Supp.1984). Under this statute, after any appeal to the designated review agency, the State Tax Department,[6] the decision of the Tax Department is to be considered the final decision of the state agency, SHPDA. Additionally, this statute mandates that review of SHPDA decisions, at both the administrative level and the circuit court level, is to be conducted in accordance with West Virginia Code § 29A–5–4 (1980 Replacement Vol.), the Administrative Procedures Act provision governing the review of contested decisions of most state agencies.[7] Accordingly, the review of the Tax Department's decision by the Circuit Court of Mercer County was limited to the parameters of subsection (g) of that statute. We recently summarized the directives of this subsection in *Shepherdstown Volunteer Fire Department v. Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983), where, in Syllabus point 2, we stated that:

> Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Thus, the fundamental question presented is whether the circuit court, under its limited review capacity, was correct in reversing the final agency determinations and granting the certificates of need. The circuit court's decision may only be upheld if the agency determinations were contrary to the standards set forth in West Virginia Code § 29A–5–4(g) (1980 Replacement Vol.).

### III

The assignments of error in this case collectively bring into issue the proper effect and weight to be given an administrative determination that a proposal in a certificate of need application is inconsistent with the State Health Plan. To begin, the circuit court's reversal was partially

---

**6.** By Executive Order 9–78 the governor duly appointed the State Tax Department as the review agency for appeals from SHPDA decisions.

**7.** The pertinent sections of West Virginia Code § 16–2D–10 (Supp.1984) discussed above provide that:

(a) A final decision of the state agency [SHPDA] ... shall upon request of any affected persons ... be reviewed by an agency of the State (other than the state agency) designated by the governor....

(b) To the extent not inconsistent with this section, for the purpose of administrative reviews of agency decisions, the review agency ... shall review appeals in accordance with the provisions governing the judicial review of contested administrative cases in section four, article five, chapter twenty-nine-A of this Code ...

(e) The decision of the reviewing agency shall be considered the final decision of the state agency

....

(f) Upon entry of a final decision by the reviewing agency ... any ... "person adversely affected by the review" [has] standing in and may ... take an appeal at the election of the petitioner, in either the circuit court of Kanawha County, or in the circuit court of the county in which the petitioner or any of the petitioners resides or does business, from any decision of the state agency granting, with or without conditions, denying or withdrawing a certificate of need or exemption. The decision of the review agency shall be reviewed by such circuit court in accordance with the provisions for the judicial review of administrative decisions contained in section four, article five, chapter twenty-nine-A of this Code. *See also* West Virginia Code §§ 16–29B–12 & –13 (Supp.1984).

grounded upon the conclusion that the denial of these applications based upon a finding of inconsistency with the State Health Plan resulted in an arbitrary and capricious review because the agency failed to consider the applicants' proposals under federal and state statutory "needs" criteria. *See* 42 U.S.C. § 300n–1(c) (1982); West Virginia Code § 16–2D–6 (Supp.1984). Therefore, we shall initially address the procedural effect to be given an agency denial of an application based solely upon a finding of inconsistency with the Plan.

The relevant statutory and regulatory provisions clearly establish the role of the State Health Plan in the application review process. The general rule is stated in West Virginia Code § 16–2D–9(b) (Supp.1984), which provides in pertinent part that, "a certificate of need may only be issued if the proposed new institutional health service is:

(1) Found to be needed; *and*

(2) Except in emergency circumstances that pose a threat to public health, *consistent with the state health plan....*" (emphasis added.)

*See also* West Virginia Board of Health Legislative Rules, Ch. 16–2D (Series I) § 10.03 (1983).[8] Under this statute it is implicitly left within the agency's discretion to address these two statutory review requirements in an order it finds most expedient and appropriate for each case. Both SHPDA and the review agency thoroughly examined the BCH and PCH proposals before determining that they were clearly inconsistent with the State Health Plan. However, the circuit court, concluded, in accordance with the applicants' contentions, that no denial was proper without findings on applicable criteria pertaining to need. We find this latter conclusion unsupportable under the clear language of section 16–2D–9(b).

The applicants cite to authorities from other jurisdictions to support their argument that denial of a certificate of need based solely upon a statistical bed need formula is arbitrary and capricious. *See Irvington General Hospital v. Department of Health,* 149 N.J.Super. 461, 374 A.2d 49 (1977); *Fairfield Nursing Home v. Whalen,* 64 A.D.2d 802, 407 N.Y.S.2d 923 (1978); *Sturman v. Ingraham,* 52 A.D.2d 882, 383 N.Y.S.2d 60 (1976). However, these cases do not address the bed need issue within the context of a statutory mandate of consistency with a state health plan similar to West Virginia Code § 16–2D–9(b) (Supp.1984). Rather, these cases primarily question the method of determination and application under each particular set of facts, issues we shall address later in this opinion.

Concerning the specific question of whether an otherwise proper bed need determination within a state health plan requires denial of an application based upon that determination alone, we find persuasive the reasoning contained in *Statewide Health Coordinating Council v. General Hospitals of Humana, Inc.,* 280 Ark. 443, 660 S.W.2d 906 (1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2386, 81 L.Ed.2d 344 (1984). In that case, although the evidence clearly indicated that the proposal was contrary to the bed need of the area as contained in the state health plan, the state's health planning and development agency found consistency with the plan based upon other independent factors and granted the certificate of need. The Arkansas court reversed, stating that:

It is a contradiction to declare the application consistent with the State Health Plan when in fact it is flatly and unmistakably contrary to that plan.

Counsel for Humana do not and could not seriously argue that the proof supports the State Agency's determination.

---

**8.** This requirement in the State program is intended to establish compliance with the federal act, which mandates in similar language that certificate of need programs "shall provide that ... (B) each decision to issue a certificate of need ... (ii) shall, except in emergency circumstances that pose a threat to public health, be consistent with the State health plan in effect

for such State...." *See* 42 U.S.C. § 300m–6(a)(5) (1982); 42 C.F.R. § 123.403(d) (1983). The limited exception for "emergency circumstances" is not applicable to the present applications. *See* West Virginia Board of Health Legislative Rules, Ch. 16–2D (Series I) § 2.08 (1983).

Instead, it is contended that the federal and state laws are mere guidelines which the director of the State Agency is free to disregard if he chooses to do so. If that were true, the entire federal and state effort to confine the number of hospital beds to the target limitation would be futile, for every agency director would be free to ignore the limitation whenever he saw fit to do so. The short answer is that the laws and regulations specify the exceptional circumstances under which the fixed bed limit may be exceeded. No such exception has been demonstrated in this instance. 280 Ark. at 449, 660 S.W.2d at 910.

We note that a review of the record does reveal that both BCH and PCH have cited specific problems at their respective hospitals that would appear to warrant changes in their facilities. The appellants do not dispute this point. Rather, the appellants maintain that the substantial acute care bed components of the instant proposals, being contrary to the State Health Plan, make these particular proposals an inappropriate means to solve these problems. As in *Statewide Health Coordinating Council v. General Hospitals of Humana, Inc.,* *supra,* favorable findings of need regarding some aspects of these proposals would not have overcome the statutory requirement of consistency.

■ Therefore, we conclude that under West Virginia Code § 16–2D–9(b) (Supp.1984), the legislature has provided that a certificate of need may only be issued upon a finding that the proposed health service is both needed and consistent with the State Health Plan. Neither the State Health Planning and Development Agency nor a reviewing tribunal is statutorily empowered to issue a certificate of need without clear findings and conclusions of compliance with both requirements. Accordingly, once it has been determined that denial of a certificate of need application is clearly mandated by the absence of one of these requirements, a determination regarding the other is unnecessary.[9]

■ Turning to the actual determination of inconsistency, we note at the outset that under the review standards set forth in West Virginia Code 29A–5–4(g) (1980 Replacement Vol.), an agency's determination of matters within its area of expertise is entitled to substantial weight. This does not mean a court should shirk its obligation to make a searching and careful inquiry into the facts:

> But that function must be performed with conscientious awareness of its limited nature. The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise. The immersion in the evidence is designed *solely* to enable the court to determine whether the agency decision was rational and based on consideration of the relevant factors. *Ethyl Corporation v. Environmental Protection Agency,* 541 F.2d 1 (D.C.Cir.1979), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49

9. We recognize that findings and conclusions on all factors, even those rendered immaterial by a determinative outcome on another factor, may in some cases avoid a possible remand later. However, this is insufficient reason to unnecessarily complicate and slow down the administrative process in every case coming before an agency.

Additionally, we note that the circuit court in the instant case, after reversing the agency determination on consistency with the Plan, decided to grant these certificates of need without the benefit of first remanding the case for the agency's findings relating to need. We find this decision, at the least, highly questionable in this instance. To begin, a review of the circuit court's findings and conclusions in light of the minimum criteria which are required by law to be considered reveals that many of the applicable criteria were not touched upon. More importantly, however, the court's duty was to review the *agency's* determination of these matters. While this Court has recognized that flagrant agency error and neglect of duties, as well as concerns for finality in litigation, may justify a circuit court's decision to independently review the evidence and enter an appropriate order, this was clearly not the case in this instance. *See, e.g., Jones v. Mullen,* 166 W.Va. 538, 276 S.E.2d 214 (1981).

L.Ed.2d 394 (1976) (citations omitted) (emphasis in original).

In the case at hand, SHPDA's denial of the applications, upheld by the review agency, was due to inconsistencies with the Acute Care chapter of the State Health Plan. The principle inconsistencies were found under Objective DT 4–1.5 of that chapter, generally known as the bed-need formula.[10] Utilization of the bed-need formula for a given area establishes the acceptable minimum and maximum projected bed supply levels for that study area, in this case Mercer and McDowell counties. Accordingly, SHPDA determined that based upon 1981 bed-use data, the BCH and PCH bed expansion proposals, taken jointly or individually, exceeded the projected acceptable bed supply for that area.

The thirteen proposed substance abuse beds contained in the PCH application were not included in the calculations of the projected bed supply for acute care in the study area. Although SHPDA found that the proposed substance abuse beds (and psychiatric acute care beds) would contribute to the attainment of Objective 9–1.1 of the Behavioral Health Chapter of the State Health Plan, SHPDA held that PCH's main proposal for medical/surgical acute care expansion presented inconsistencies with the State Health Plan which could not be overcome by this one positive component. We note that the record indicates that during the application stage PCH declined to follow the encouragement offered by SHPDA to consider revising its proposal to avoid this fatally defective aspect. The evidence contained in the record indicates that with proper development, PCH would have little difficulty obtaining a certificate of need from SHPDA for a proposal tailored to meet the objectives of the Behavioral Health Chapter of the Plan.

On appeal to the review agency, the applicants challenged the determination of the potential bed need for the study area. Specifically, their objections were based upon the ground that the determination ignored the need for their particular services by the part of the population residing in areas that do not fall within the defined study area. The definition of "study area," as contained in the Acute Care chapter of the Plan provides that, "For acute care beds and services, the study area will be the county of proposal and any adjacent county specifically impacted." A significantly impacted county is defined as: "(a) a county wherein at least 25% of the residents rely on or will rely on the acute care services in the county of proposal; or (b) a county which generates or will generate at least 10% of the patient load in the county of proposal."

In determining potential bed need for the area, SHPDA utilized patient flow statistics for that area contained in the State Health Plan, which were obtained through a scientific survey by the West Virginia Health Systems Agency in 1978–79. This data is a measure of the patient flow into and out of the service area for hospitalization. From the net migration figures[11] the agency can take into account the number of beds in the area actually used by patients from outside the area. One of the applicants, BCH, presented evidence that in-migration to its hospital had substantially increased since the patient flow study utilized by the agency was performed. However, the review agency found this data unreliable because BCH presented no comparable figures to account for the relevant out-migration during the same period.

---

**10.** Objective DT 4–1.5 of the State Health Plan provides that:

By 1986, the number of acute care beds in any area of the State shall be within the range of acceptable bed supply taking into consideration:
1.  Use rates (patient days of care per thousand population)
    a.  An expected use rate based on the age distribution of the population of the area;
    b.  The actual current rate for the area;

2.  Acceptable occupancy levels based on the size of hospitals in the area;
3.  Population projections for the area; and
4.  Flow of patients into and out of the area for hospitalization.

**11.** In-migration, patients coming from outside the area for health services, is offset by out-migration, patients from within the area leaving for services, to arrive at the net figure.

Additionally, the review agency found that there was substantial evidence to support the reasonableness of the SHPDA methodology, where it stated as follows:

Based upon the above statistical information, SHPDA in its decision determined that the total of 172 beds were used in study area hospitals by the patients originating from outside the study area, from Virginia, or from anywhere else in West Virginia. After deducting the 172 beds used by residents from outside the study area, the remaining beds were accounted as the available beds for the population of the study area. (SHPDA's Decision at 13.-14). While the study area, so determined by SHPDA, effectively excluded the sporadic segments of population residing in numerous counties outside the study area, it allocated the beds used by these populations. Thus, the designation of a study area based on county lines does not, *per se*, foreclose the possibility of considering the need related factors which may exist beyond the county lines. In fact, SHPDA did look beyond mere political subdivisions to determine the need analysis for the Appellants' proposals. The ultimate question of need which could reasonably be determined by existing demographic data established on a county by county basis is a proper and acceptable method widely approved by the courts in various states.

(Citing *Olathe Hospital Foundation, Inc., v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1 (1975); *Tarpon Springs General Hospital v. Department of Health,* 366 So.2d 185 (Fla.App.1979), *cert. denied,* 374 So.2d 101 (1979).

■ Finally, the agency noted that if the county lines had been used merely as a rigid or an artificial geographical segmentation without taking into account other

factors relevant to bed need projections, their conclusion might have been otherwise. Therefore, the agency found no reversible error in this instance because "the record clearly indicates that the needs of surrounding counties, which did not qualify as part of the study area, were taken into consideration by SHPDA." A review of the record regarding the agency's methodologies for determining and utilizing bed need statistics convinces this Court that no point of error on these matters rises to the level of being contrary to the standards of West Virginia Code § 29A–5–4(g) (1980 Replacement Vol.).

■ SHPDA also reviewed these applications under 1982 bed-use data supplied by BCH during the application review period. Based upon these more recent figures, which had the effect of raising the upper end of the acceptable bed supply limit, it was determined that the BCH and PCH proposals together, and the PCH proposal alone, still exceeded the maximum acceptable bed supply and were thereby inconsistent with the fundamental requirements of DT 4–1.5 of the State Health Plan. The BCH proposal under the 1982 bed-use data, however, fell within the acceptable bed supply range. Therefore, SHPDA proceeded to review the BCH proposal under Recommended Action 7(b) of DT 4–1.5.[12] Recommended Action 7(b) sets forth the review criteria applicable to determinations of consistency with the Acute Care Chapter of the State Health Plan in those cases where proposals place the projected bed supply for a study area somewhere between the minimum and maximum acceptable levels. Under this section a proposal may be found consistent with the Acute Care Chapter if:

i. The proposed addition is a new or replacement facility designed to serve a population of at least 10,000

---

**12.** We note at this juncture that BCH contends in its brief to this Court that the Recommended Actions following each Objective contained in the State Health Plan, are, by virtue of their own labeling, only recommendations and not requirements. We find no merit in this argument. The Introduction to the Plan clearly provides that "[t]hese are the actions which have been chosen for implementation to achieve the

objective." 1982 State Health Plan, p. 10. Furthermore, a review of the Recommended Actions in the Acute Care Chapter alone indicate that their purpose is to lend flexibility to the objectives to allow for exceptional circumstances which may reasonably be accommodated within the previously planned limits under the document.

not presently within 30-minutes' driving time of an existing facility, and the proposed number of beds is related to a market penetration of the population to be served that can be justified; or

ii. The proposed addition is for needed specialized service that cannot be established or expanded by the conversion of beds in any existing facility that serves the same population; or

iii. The applicant can justify a projected increase in the area's current utilization rate that would support the additional beds requested, provided that the projected rate does not exceed the U.S. age-adjusted rate for the area; or

iv. The proposal serves the attainment of other objectives in the SHP which could not be achieved in the absence of the proposal.[13]

SHPDA determined that that the BCH proposed expansion project failed to satisfy any of the above criteria. Therefore, even under the bed supply limits based upon 1982 data SHPDA found that the BCH proposal remained inconsistent with the State Health Plan. BCH contends, for various reasons, that one or more of these exceptions do apply to its proposal. However, Recommended Action 7(b) permits, but does not require, SHPDA to find consistency with the Plan if one of the enumerated circumstances is present. Under the evidence contained in the record relating to the applicability of these exceptions we cannot conclude that the agency findings were clearly wrong or manifest an abuse of discretion.

In conclusion, our review of the record reveals that the final agency findings and conclusions did not prejudice the substantial rights of the applicants in that the determinations were not contrary to the standards set forth in West Virginia Code § 29A–5–4(g) (1980 Replacement Vol.). For the foregoing reasons, the final order of the Circuit Court of Mercer County is hereby reversed and the decisions of the State Health Planning and Development Agency and the State Tax Department reinstated.

Reversed.

---

**13.** As previously discussed, utilization of the 1981 bed-use data indicated that either proposal alone would exceed the upper limit of acceptable bed supply; and utilization of the 1982 data indicated that both proposals together, and the PCH proposal standing alone, exceeded the upper limit. Therefore, SHPDA also considered the single exception to DT 4–1.5 which would allow a finding of consistency with the State Health Plan for proposals for the addition of acute care beds which exceed the upper limit of acceptable bed supply. Recommended Action

7(c) permits a finding of consistency in this situation if:

i. The proposed addition is a new facility designed to serve a population of at least 10,000 not presently within 30-minutes' driving time of an existing facility, and the proposed number of beds is related to a market penetration of the population to be served that can be justified.

SHPDA's determination of the inapplicability of this exception to these proposals is undisputed.