631 S.E.2d 598

Lillian GIBSON, Administratrix of the Estate of Angela Dawn Huffman Anderson, Petitioner Below, Appellant

v.

NORTHFIELD INSURANCE COMPANY, et al., Respondents Below, Appellees.

No. 32690.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 11, 2005.

Decided Dec. 2, 2005.

Margaret L. Workman, Esq., Charleston, Attorney for Appellant.

Michael J. Farrell, Esq., Robert L. Hogan, Esq., Farrell, Farrell & Farrell, Huntington, Attorneys for Appellees.

STARCHER, J.:

In this appeal from the Circuit Court of Kanawha County, we are asked to examine a "defense within limits" provision in an automobile liability insurance policy purchased by the City of Charleston. In a typical liability insurance policy, the insured receives indemnification up to the policy limits under one portion of the policy, and an unfettered defense against claims in another portion of the policy. But in a defense within limits policy, all costs of defense are chargeable against, and thereby erode or reduce, the indemnification policy limits. When the policy limits are exhausted—whether through the payment of claims to third parties or the payment of defense costs—the insurance company's obligation to provide coverage and a defense terminates, and the City is exposed to any additional liability.

The appellant filed the instant declaratory judgment action against the City's insurance company to determine the validity of the defense within limits provision. The appellant first learned of the provision in the course of a wrongful death lawsuit against the City, when the City revealed that nearly one-third of its liability coverage had been consumed by the insurance company for its attorney and litigation costs. The appellant contended that the defense within limits provision violated West Virginia law and public policy. The circuit court, however, entered an order concluding that the defense within limits provision in the City of Charleston's policy did not violate West Virginia law or public policy.

As set forth below, we reverse the circuit court's order.

## I.

### Facts & Background

On the afternoon of May 8, 1999, Robert T. Anderson and his wife, Angela Anderson, were riding on a motorcycle on MacCorkle Avenue in Charleston, West Virginia. They were accompanied by three other motorcyclists. As they approached the intersection with Route 119 (also called "Corridor G"), an ambulance owned by the City of Charleston passed through a red light and into the path of the four motorcycles. While the ambulance was responding to a request for emergency services and had its emergency lights on, the ambulance paused only briefly before proceeding into the intersection.[1] Three of the motorcycles plowed into the side of the ambulance; the fourth motorcycle missed the ambulance, but wrecked.

Mr. Anderson sustained serious injuries when his motorcycle impacted the ambulance; Mrs. Anderson was thrown from the motorcycle and died of her injuries the next day. Thereafter, Mr. Anderson and the administratrix of Mrs. Anderson's Estate, appellant Lillian Gibson, retained different attorneys. The attorney representing Mr.

Anderson filed a personal injury suit against the City on August 20, 1999; a wrongful death action on behalf of Mrs. Anderson's Estate was filed on November 16, 1999. Thereafter these two actions were consolidated for discovery and trial.

The City of Charleston had purchased a "Public Entity All Lines Aggregate" insurance policy from the appellant, Northfield Insurance Company ("Northfield"). The policy contained an "aggregation" of numerous types of coverage,[2] but pertinent to this case contained a $1,000,000.00 limit for automobile liability coverage. The policy was effective from March 31, 1999, until March 31, 2000.

Under most liability insurance policies, the insurance company has the twin, but separate, duties of indemnifying the insured against liability for a claim within the limits of the policy, and in addition to the limits of the policy providing a defense of any claim. However, by 2001, the attorneys for Mr. Anderson and Mrs. Anderson's Estate discovered that the City of Charleston's liability insurance policy had a "defense within limits" provision that included defense costs and litigation expenses within the limits of liability coverage.[3] Under this provision, the $1,000,000.00 limit available for paying liabili-

---

1. *W.Va.Code*, 17C–2–5 [1971] provides ambulance drivers with the authority to run a red light, but only after slowing down and proceeding when it is safe to do so:

 (a) The driver of an authorized emergency vehicle, when responding to an emergency call ... may exercise the privileges set forth in this section, but subject to the conditions herein stated.
 (b) The driver of an authorized emergency vehicle may: ...
 (2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation; ...
 (c) The exemptions herein granted to an authorized emergency vehicle shall apply only when the driver of any said vehicle while in motion sounds audible signal by bell, siren, or exhaust whistle as may be reasonably necessary, and when the vehicle is equipped with at least one lighted flashing lamp ... which is visible under normal atmospheric conditions from a distance of five hundred feet to the front of such vehicle ....
 (d) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the

safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

2. The policy purchased by the City contains coverage protecting against loss or damage to the City's real and personal property; coverage against general liability; auto liability coverage and uninsured and underinsured motorist protection; errors and omissions liability coverage; and coverage protecting against employee dishonesty.

3. "A policy in which the limit of liability available for paying losses is reduced by the costs of defense is called a 'defense within limits' (DWL) policy. Such a policy is also known as a 'wasting,' 'cannibalizing,' 'self-consuming' or 'self liquidating' policy because its available indemnity limit may be eaten or 'wasted' by the costs of defense." Gregory S. Munro, "Defense Within Limits: The Conflicts of 'Wasting' or 'Cannibalizing' Insurance Policies," 62 Mont.L.Rev. 131, 133 (Winter 2001) (footnotes omitted). The appellee suggests that such a policy is also known as a policy with "eroding" or "exhausting" limits. *Brief of the Appellee* at 33, note 20.

ty claims was first reduced by the costs of investigating and defending these claims.

The attorney representing the appellee thereafter filed the instant declaratory judgment action against appellant Northfield, asserting that the defense within limits provision violated state law and public policy, and asked the circuit court to reform the insurance policy to include a total of $1,000,000.00 in liability coverage.

In July 2002, the attorneys for Mr. Anderson and Mrs. Anderson's Estate learned that defense litigation expenses had consumed over thirty percent of the City's insurance coverage, and that the amount of insurance coverage available continued to be reduced by ongoing defense attorney fees and costs.[4] On July 12, 2002, the parties agreed to settle their claims against the City for the remaining balance of policy limits, a total of $688,361.86—ostensibly to avoid further "cannibalization" of the policy limits by the insurance company for defense costs. Of that amount, Mr. Anderson received $150,000.00, and in return he waived his right to pursue any additional relief.

Mrs. Anderson's estate received the remaining $538,361.86. However, as part of the settlement, the attorney representing Mrs. Anderson's Estate reserved the right to pursue her declaratory judgment action against Northfield for the remaining proceeds of the $1,000,000.00 liability policy—that is, the $311,638.14 spent by the insurance company on defense costs to the date of the settlement.[5]

After conducting discovery, the parties submitted the petition for declaratory relief to the circuit court for decision. On April 8, 2004, the circuit court entered an order denying the appellant's request for declaratory relief and dismissed the case. The circuit court concluded that the insurance policy purchased by the City of Charleston was a "custom-designed insurance policy," and that as a custom-designed policy it could incorporate language that might violate specific requirements of West Virginia law. While the circuit court considered the appellant's argument that the Northfield insurance policy violated public policy, the court found that the public policy arguments advanced by the appellant were without merit. In dismissing the appellant's case, the circuit court refused to reform the policy to include $1,000,000.00 in liability coverage exclusive of defense attorney fees and litigation expenses.

The appellant now appeals the circuit court's April 8, 2004 order.

## II.

### Standard of Review

Our standard of review in this case is *de novo*. Syllabus Point 3 of *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995), holds: "A circuit court's entry of a declaratory judg-

---

4. The City of Charleston's policy limits were not reduced solely by litigation with the Andersons. Two other motorcyclists involved in the accident filed personal injury actions against the City, and pursued their claims to trial. The City, claiming at trial that it did nothing wrong in running the red light, was successful and received a defense verdict. The costs of defending these two other lawsuits contributed to the $311,638.14 in total litigation expenses that reduced the City's policy limits.

5. The settlement agreement between the City of Charleston and appellant Lillian Gibson, individually and as administrator of the Estate of Angela Anderson, states in part:

It is understood and agreed between the parties hereto that the release and dismissal of the City of Charleston as a defendant for all claims asserted by the Estate of Angela Anderson does not limit, impair, settle or resolve the claims by the Estate of Angela Anderson against Northfield Insurance Company … pending in the

Circuit Court of Kanawha County, West Virginia, relating to the reformation of the limits of The City of Charleston's insurance policy except to the extent that payment hereunder shall constitute a judgment credit in favor of Northfield Insurance Company against any judgment or verdict therein. Specifically, the Estate retains the right to proceed on the declaratory judgment action and if the Court reforms the policy to a non-eroding policy of One Million Dollars ($1,000,000), the insurer agrees that the Estate will be entitled to the difference between the policy limits as eroded and the reformed policy limits. In addition, should the Estate prevail in the declaratory judgment action, the Estate retains the right to be reimbursed by Northfield Insurance Company for its attorney's fees associated with the declaratory judgment action, at a rate of One Hundred Sixty Dollars ($160.00) per documented hours, from the date of this settlement.

ment is reviewed *de novo*." More specifically, this Court stated in *Cox* that "because the purpose of a declaratory judgment action is to resolve legal questions, a circuit court's ultimate resolution in a declaratory judgment action is reviewed *de novo*; however, any determinations of fact made by the circuit court in reaching its ultimate resolution are reviewed pursuant to a clearly erroneous standard." 195 W.Va. at 612, 466 S.E.2d at 463.

## III.

### *Discussion*

The insurance policy issued to the City of Charleston by appellee Northfield provides automobile liability insurance coverage using the following language:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured [6] for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or assumed by the Assured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term 'ultimate net loss', arising out of any occurrence on account of bodily injury including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or persons (excepting employees of the Assured injured in the course of their employment), and/or damage to or destruction of property or the loss of use thereof, arising out of the ownership, maintenance or use of any automobile.

The declarations page of the policy states that the limits of liability for such automobile liability coverage "shall not exceed ... $1,000,000 each and every loss/and or occurrence ... Ultimate net loss." [7]

The resolution of this case centers upon the validity and effect of the policy's definition of "ultimate net loss." It is the "ultimate net loss" provisions that convert the policy into a defense within limits policy. The policy defines "ultimate net loss" in the context of automobile liability coverage in this way:

> For Section III ["Automobile Liability"], the term "ultimate net loss" shall mean the total sum which the Assured becomes obligated to pay by reason of bodily injury or property damage claims, either through adjudication or compromise, after making proper deductions for all recoveries and salvages.
>
> "Ultimate net loss" shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, expenses for doctors and nurses, also law costs, premiums on attachment of appeal bonds, expenses for lawyers and investigators and other persons for litigation, settlement, adjustment and investigation of claims or suits which are paid as a consequence of any occurrence covered hereunder.

The appellant argues, *inter alia*, that the defense within limits language contained in the definition of "ultimate net loss" is contrary to public policy and should be unenforceable in an automobile liability insurance policy purchased by a governmental entity. The appellant also argues that, as a matter of law, every ambulance provider is required to have liability insurance coverage of $1,000,000.00.[8] The appellant takes the posi-

---

6. The parties do not dispute that the driver of the ambulance owned by the City of Charleston was an "assured" entitled to coverage under the policy. The policy defines an "assured" as:

 not only the Named Assured but also: -
 1. any official... or employee of the Named Assured while acting within the scope of his duties as such ...
 2. under Section III ["Automobile Liability"] any person defined in 1. above while using an owned automobile of the Named Assured[.]

7. The declarations page notes, however, that the City had agreed to pay $50,000.00 as a "self-

insured retention" for "each and every loss and/or claim and/or occurrence ultimate net loss[.]"

8. *W.Va.Code* 16–4C–16(1) [1996] states, in pertinent part:

 Every ... emergency ambulance service or other person which employs emergency medical service personnel ... shall obtain a policy of insurance insuring ... against loss from the liability imposed by law for damages arising from any error or omission in the provision of emergency medical services as enumerated by

tion that an insurance company's inclusion of a defense within limits provision like that in appellee Northfield's policy, which reduces an emergency ambulance service provider's liability insurance coverage, violates public policy. Furthermore, as a general principle, the appellant contends that such a policy provision contained in a motor vehicle insurance policy also violates public policy.

The appellee argues, *inter alia*, that the insurance policy purchased by the City of Charleston is a "custom-designed policy." The appellee concedes that for the typical insurance customer an insurance policy must contain the minimum types and amounts of coverage required by various statutes. However, the appellee argues that state law permits a governmental entity to purchase a custom-designed policy that does not meet the minimum statutory requirements. The appellee contends that the determination of whether a policy is custom-designed for a governmental entity does not depend upon the amount or degree of negotiation that went into the formation of the policy, and does not depend upon the particular words used in the policy. Instead, the appellee contends that a policy is custom-designed simply when it is different from the common, standardized, run-of-the-mill policy.

In sum, the appellee argues that the facts presented below show that the policy purchased by the City of Charleston is substan-

tially different from most insurance policies, and is therefore custom-designed. Accordingly, even if the City's policy does not contain the statutorily-required elements of an insurance policy, the appellee argues that the policy is still enforceable.

The appellant counters by pointing out that the record shows that the City's manager simply requested that the appellee provide an insurance policy with $1,000,000.00 in liability coverage. The appellee argues that no specific, individualized provisions designed to meet the City's needs were requested, negotiated or included in the policy. Furthermore, the appellant asserts that the policy provided to the City of Charleston was a form policy which, in discovery below, the appellee admitted it had sold to dozens or hundreds of municipalities nationwide. The appellant therefore argues that the policy was not custom designed for the City, but was merely a form. To the extent the policy violates West Virginia law, the appellant argues that the policy should be reformed.

"In construing any insurance policy, it is appropriate to begin by considering whether the policy language is in accord with West Virginia law." *Adkins v. Meador*, 201 W.Va. 148, 153, 494 S.E.2d 915, 920 (1997). The terms of the policy should be construed in light of the language, purpose and intent of the applicable statute. Provisions in an

---

this article, in an amount no less than one million dollars per incident[.]

Appellee Northfield argues that while this statute imposes a duty upon providers of emergency ambulance services to obtain $1,000,000.00 in errors and omissions coverage, it imposes no such duty on insurance companies to provide that coverage. Still, Northfield argues that it did meet the City of Charleston's needs under this statute by providing $1,000,000.00 in errors and omissions coverage.

However, Northfield asserts that the errors and omissions coverage in its policy protects the City of Charleston only in case of injuries caused by professional mistakes in the provision of medical care by ambulance employees. It does not provide coverage for errors in the operation of a motor vehicle. A leading treatise states:

Errors and omissions policies form the equivalent to malpractice insurance for occupations other than those in the legal and medical fields. Such policies are designed to insure members of a particular professional group from liability arising out of special risks such

as negligence, omissions, mistakes and errors inherent in the practice of their profession[.]

Lee R. Russ, 9 *Couch on Insurance, Third Edition*, § 131:38 at 131–49 (2000).

We are not entirely persuaded by the appellee's interpretation of the policy. On the one hand, the errors and omissions section of the policy provides broad coverage for any "act of neglect or breach of duty including misfeasance, malfeasance, and non-feasance by the Assured." On the other hand, the exclusions section of the policy eliminates coverage for any claim "for bodily injury or property damage" or any claim "arising out of the rendering of or failure to render ... medical, surgical, dental, x-ray or nursing service or treatment" or "furnishing or dispensing of drugs or medical ... supplies."

However, because we resolve this case through an analysis of the automobile liability coverage of the policy, we do not need to consider the parties' arguments regarding *W.Va.Code*, 16–4C–16(1) and the errors and omissions coverage of the policy.

insurance policy that are more restrictive than statutory requirements are void and ineffective as against public policy. *See* Syllabus Point 2, *Universal Underwriters Ins. Co. v. Taylor*, 185 W.Va. 606, 408 S.E.2d 358 (1991); Syllabus Point 1, *Bell v. State Farm Mut. Auto. Ins. Co.*, 157 W.Va. 623, 207 S.E.2d 147 (1974); Syllabus Point 2, *Johnson v. Continental Casualty Co.*, 157 W.Va. 572, 201 S.E.2d 292 (1973).

■ When the language of an insurance policy is contrary to statute and therefore void, the policy should be reformed and construed to contain the coverage required by West Virginia law. *W.Va.Code*, 33-6-17 [1957] mandates that:

Any insurance policy, rider, or endorsement hereafter issued and otherwise valid which contains any condition or provision not in compliance with the requirements of this chapter, shall not be thereby rendered invalid but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy, rider, or endorsement been in full compliance with this chapter.

We begin our consideration of the parties' positions by looking to the insurance code, and specifically to the required elements of a motor vehicle insurance policy. *W.Va.Code*, 33-6-31(a) [1998] mandates that every automobile insurance policy sold in West Virginia must contain coverage that protects the named insured against liability for death, bodily injury, loss or damage that results from negligence in the operation or use of a vehicle. *W.Va.Code*, 33-6-31(a) [1998] requires the following coverage:

No policy or contract of bodily injury liability insurance, or of property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle, shall be issued or delivered in this state to the owner of such vehicle, or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle for which a certificate of title has been issued by the division of motor vehicles of this state, unless it shall contain a provision insuring the named insured and any other person ... responsible for the use of or using the motor vehicle with the consent, expressed or implied, of the named insured ... against liability for death or bodily injury sustained or loss or damage occasioned within the coverage of the policy or contract as a result of negligence in the operation or use of such vehicle by the named insured or by such person[.]

Notably absent from *W.Va.Code*, 33-6-31(a) is any requirement that an automobile liability insurance policy, in addition to protecting the insured up to the policy's limits against liability for death or bodily injury or loss or damage to a third party, also expend the policy limits to protect the named insured against the fees and expenses incurred by the insured or by the insurance company in defending claims. This code section is silent concerning whether liability coverage, intended by the Legislature to protect the interests of injured third parties, may be reduced by the tortfeasor's expenses or the expenses of the tortfeasor's insurance company—expenses such as law costs, fees for lawyers and investigators, or expenses for the litigation, settlement, adjustment and investigation of claims or suits—arising as a result of the tortfeasor's negligence in the operation or use of a vehicle. The statute does not state that liability coverage should protect the named insured against liability for death, bodily injury, loss or damage *and* the insured's and the insurance company's litigation expenses, attorney fees and other costs incurred as a result of the negligent operation or use of a motor vehicle.

■ "In the interpretation of statutory provisions the familiar maxim *expressio unius est exclusio alterius*, the express mention of one thing implies the exclusion of another, applies." Syllabus Point 3, *Manchin v. Dunfee*, 174 W.Va. 532, 327 S.E.2d 710 (1984). "This doctrine informs courts to exclude from operation those items not included in the list of elements that are given effect expressly by statutory language." *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 630 n. 11, 474 S.E.2d 554, 560 n. 11 (1996). "[E]xplicit direction for something in one provision, and its absence in a parallel provision, implies an intent·to negate it in the second context."

*Clinchfield Coal Co. v. FMSHRC*, 895 F.2d 773, 779 (D.C.Cir.1990).

*W.Va.Code*, 33–6–31(a) expressly requires that a motor vehicle insurance policy contain a provision insuring the named insured and any other person responsible for the use of or using the motor vehicle against liability for another's death, bodily injury, property damage or loss sustained as a result of negligence in the operation or use of such vehicle. Because the code section is silent regarding the inclusion of additional types of coverage under the rubric of death, bodily injury or property damage liability coverage, we infer that the Legislature intended to prohibit insurance companies from reducing the required types of coverage by including other forms of coverage.

◼ We therefore conclude that *W.Va. Code*, 33–6–31(a) expressly requires that a motor vehicle insurance policy contain a provision insuring the named insured and any other person responsible for the use of or using the motor vehicle against liability to another for death, bodily injury, loss or damage sustained as a result of negligence in the operation or use of such vehicle. Any additional provision in a motor vehicle insurance policy which tends to limit, reduce or nullify that statutorily-mandated liability coverage, such as a "defense within limits" or similar provision that allows defense costs and litigation expenses to be deducted from the limits of liability coverage is void and ineffective as against public policy.

Therefore, in the typical motor vehicle insurance policy, it would violate *W.Va.Code*, 33–6–31(a) to include a defense within limits provision that "erodes," "exhausts," "wastes," and "cannibalizes" the death, bodily injury, loss or damage liability coverage of the policy. It would violate the intent of the Legislature to reduce or nullify a vehicle owner's liability coverage by charging insurance claims management expenses against that statutorily-required liability coverage.

The question remains, however, whether the defense within limits provision in Northfield's "ultimate net loss" definition is enforceable in the City of Charleston's policy. If the Northfield policy was "custom-designed," such that the City deliberately chose to purchase a policy with automobile liability coverage that was contrary to the requirements of *W.Va.Code*, 33–6–31(a), then the defense within limits provision might be enforceable.

◼ *W.Va.Code*, 29–12A–16 [2003] permits a municipality to purchase a custom-designed policy that is at odds with statutory requirements that are binding upon the general public. *W.Va.Code*, 29–12A–16(a) states, in part:

A political subdivision may use public funds to secure insurance with respect to its potential liability and that of its employees for damages in civil actions for injury, death or loss to persons or property allegedly caused by an act or omission of the political subdivision or any of its employees, including insurance coverage procured through the state board of risk and insurance management. The insurance may be at the limits for the circumstances, and subject to the terms and conditions that are determined by the political subdivision in its discretion.

We interpreted this *Code* section as follows in Syllabus Point 1 of *Trent v. Cook*, 198 W.Va. 601, 482 S.E.2d 218 (1996):

West Virginia Code § 29–12A–16(a) (1992) conveys broad discretion to both the West Virginia State Board of Risk and Insurance Management, as well as governmental entities, with regard to the type and amount of insurance to obtain. Consequently, when an insurer issues a custom-designed insurance policy to a governmental entity pursuant to the Governmental Tort Claims and Insurance Reform Act, West Virginia Code §§ 29–12A–1 to –18 (1992), that entity may incorporate language absolutely limiting liability under the policy, even if such language would otherwise violate the provisions of West Virginia Code § 33–6–31(b) (1996).

In *Eggleston v. West Virginia Dept. of Highways*, 189 W.Va. 230, 233, 429 S.E.2d 636, 639 (1993), we explained that the hallmark of a custom-designed policy is that it is "different from the usual insurance policy that is prepared and printed by an insurance company and delivered to the insured, whose

only input ordinarily is not as to its language, but as to the amount and type of coverage." In *Trent v. Cook, supra,* we attempted to clarify *Eggleston* by defining "custom-designed policy" in the following manner:

> It is a term of art, perhaps not well chosen in *Eggleston,* because its common usage suggests a sophisticated level of negotiations and specific reasoning that preceded the governmental entity's purchase of the subject insurance contract. *The term custom-designed policy actually implies nothing more than a policy whose terms stand in contrast in some manner to those of standardized insurance policies.*

198 W.Va. at 607, 482 S.E.2d at 224 (emphasis added).

Both the appellee and the appellant in the instant case rely upon the above-emphasized sentence in *Trent v. Cook* to support their position that the Northfield policy was, or was not, custom designed for the City of Charleston. The appellee asserts that its policy is custom designed because most of its provisions—including the defense within limits provisions—stand in contrast to the provisions found in typical, standardized liability insurance policies. The appellant, however, asserts that the appellee's policy was not customized for the City, but rather was standardized and typical for large public entities. The appellant contends that the record shows that policies identical to that sold to the City of Charleston have been sold by the appellee to dozens if not hundreds of municipalities nationwide.

 We begin our consideration of the parties' positions by carefully considering the statutory authority for governmental entities to purchase a "custom-designed" policy. *W.Va.Code,* 29–12A–16(a) states that a liability insurance policy purchased by a political subdivision may be subject to unique terms and conditions, but those terms and conditions must be "determined by the political subdivision in its discretion." By using the words "determined" and "discretion," we presume the Legislature intended that a governmental entity must exercise some choice, judgment, volition, wish or inclination as a result of investigation or reasoning when settling upon the particular conditions or terms of an insurance policy that are contrary to statutory requirements.[9] "It is always presumed that the legislature will not enact a meaningless or useless statute." Syllabus Point 4, *State ex rel. Hardesty v. Aracoma–Chief Logan No. 4523, Veterans of Foreign Wars of the United States, Inc.,* 147 W.Va. 645, 129 S.E.2d 921 (1963). Therefore, courts should not, in the absence of evidence to the contrary, blithely presume that a governmental entity intended to ignore its obligations under the law. For *W.Va.Code,* 29–12A–16(a) to have any meaning, a governmental entity must understand that it is waiving a particular form of available coverage required by law, and that in doing so it is exposing its employees and the public fisc to liability to others for an employee's negligence.

Our definition of "custom-designed policy" in *Trent v. Cook* is not, however, fully in accord with *W.Va.Code,* 29–12A–16(a). *Trent v. Cook* can be read to suggest that a policy is permissible under *W.Va.Code,* 29–12A–16(a) solely because its "terms stand in contrast in some manner to those of standardized insurance policies." 198 W.Va. at 607, 482 S.E.2d at 224. This statement clearly mischaracterizes the statute. To the extent that *Trent v. Cook* suggests that certain terms and conditions in a policy are permissible under *W.Va.Code,* 29–12A–16(a) merely because they stand in contrast in some manner to those of standardized policies, *Trent v. Cook* must be modified.

 We therefore hold that an insurance company may incorporate limiting terms and conditions that violate *W.Va.Code,* 33–6–31 into a governmental entity's insurance policy. However, to be permissible under *W.Va.Code,* 29–12A–16(a) [2003], the

---

9. "Determine" means "to come to a decision ... as the result of investigation or reasoning ... to settle or decide by choice of alternatives or possibilities." *Webster's Third New International Dictionary* at 616 (1976). "Discretion" means the "power of decision: individual judgment; ... power of free decision or choice within certain legal bounds ... ability to make decisions which represent a responsible choice and for which an understanding of what is lawful, right, or wise may be presupposed[.]" *Id.* at 647, 482 S.E.2d 218.

limiting terms and conditions in the insurance policy must clearly be "determined by the political subdivision in its discretion." The limiting terms and conditions must therefore be the result of some choice, judgment, volition, wish or inclination as a result of investigation or reasoning by the governmental entity. The terms and conditions are not enforceable merely because they are different from those found in the typical insurance policy. To the extent that *Trent v. Cook*, 198 W.Va. 601, 482 S.E.2d 218 (1996) says otherwise, it is modified.

■ Applied to the instant case, we conclude that the policy which the appellee provided to the City of Charleston was not a custom-designed policy. Certainly, defense within limits policy language, in which the limit of liability available for paying losses is reduced by the costs of defense, is unique and not typically found in the bulk of casualty insurance policies.[10] The insurance policy presented to the City bore all the appearances of what is defined in the insurance industry as a manuscript policy, a policy crafted to provide coverage to general groups of insureds with unique needs—in this case, public or municipal entities.[11] For instance, Section II(c) of the policy provides coverage for "law enforcement liability" to protect the City against claims for "Personal Injury, Bodily Injury, Property Damage, Violation of Civil Rights or First Aid" caused by the negligent acts of "a law enforcement official or officer[.]"

But the record below does not demonstrate that the City, through its employees or its elected representatives, consciously considered the terms and conditions contained within the Northfield insurance policy, and deliberately determined to purchase an insurance contract that was contrary to *W.Va. Code*, 33–6–31(a). The form nature of the policy, and lack of tailoring to the City's needs, is demonstrated most effectively by Section V of the Northfield policy, which sets forth provisions for workers' compensation

---

10. As one witness, Frank Baer, III, testified in a deposition, this type of insurance policy was unique among West Virginia municipalities. To his knowledge, the City of Charleston was the only municipality to have this type of policy, but not because the City specifically sought the particular terms and conditions of the policy. Instead, the City of Charleston's policy was unique because the City "self-insured" or "retained" a significant part of any loss, and no other municipality in the State was large enough to afford such a policy. As the witness stated:

A. Well, my first statement is that it's the only one of its kind that we have written. It's the only one of its kind that I know of that's written in West Virginia for any municipality. It is unlike any other policy that we have for all of our other municipalities.

It has a combined multiple covers under one package concept. It is a partially self-insured policy....

I mean, I'm just saying they use different terminology than my standard policies, but that in and of itself is not enough to make this, in my opinion, a custom designed policy. I think it's custom designed because of its very structure, because its unbundled and that it is not like any other policy we have, and it's one of one. It's in a pool of one. It's the only one of its kind in the State of West Virginia that I'm aware of for any municipality anywhere....

Q. There is nothing to stop any single municipality in the State of West Virginia from going out and taking this product and asking somebody to price it for them, is there?

A. Yeah. Size. I mean, you have to be a certain size before this becomes a possible product. West Virginia doesn't have a lot of large cities. Charleston is in a class by itself, with the exception of maybe Huntington, but beyond Charleston and possibly Huntington, no other city in the state could assume a loss fund of the size of Charleston. And this policy doesn't work with ... anything less than a twenty-five or a fifty or a hundred thousand per claim deductible, anything less than a four, five, six, seven hundred thousand dollar loss fund, and most cities, or all cities, with the exception of really Charleston, to my knowledge, couldn't afford this structure.

Q. So it's a matter of having the financial resources behind you. Isn't that correct?

A. Yeah. By and large....

Q. It's just a matter of being able to self-insure to the extent that this policy demands that the policyholder self-insure itself. Correct?

A. Yeah.

11. A deposition in the record suggests the following definition for "manuscript policy."

Q. Manuscript policy, and what is a manuscript policy?

A. It is a custom—I don't want to say custom designed policy, but it is a contract that is specifically developed by an insurance company and/or an insurance brokerage or agency operation to provide coverage for a certain select group of insur[eds] who have unique and existing characteristics.

insurance. Four pages of the policy are set aside to detail the various terms, conditions and exclusions applicable to the workers' compensation coverage. However, the declarations page of the policy notes that the City did not purchase workers' compensation coverage. Furthermore, in 1999, no private insurers were permitted to sell workers' compensation insurance in the State of West Virginia. Instead, employers—including the City of Charleston—were in most instances required to purchase coverage through the State-run Workers' Compensation Fund.[12] Any suggestion that the Northfield policy was specifically and carefully crafted to meet the unique needs of the City of Charleston is therefore thwarted by the fact the policy contains four pages of language that were wholly irrelevant in the State of West Virginia—all suggesting that the policy is simply another form policy.

We see nothing in the record to suggest that representatives for the City of Charleston exercised any discretion in selecting the "defense within limits" provision. There was no choice, judgment, volition, wish or inclination as a result of investigation or reasoning by the City; instead, the defense within limits language was included in the policy on a "take-it-or-leave-it" basis.

We therefore conclude that the appellee's policy sold to the City of Charleston was not a custom-designed policy within the meaning of *W.Va.Code*, 29–12A–16(a), and hold that the circuit court erred in ruling otherwise.

 With that established, we further hold that the circuit court erred in holding that the defense within limits, or ultimate net loss, provision of the appellee's policy did not violate public policy. Specifically, a provision which allows defense costs and litigation expenses to be deducted from the limits of automobile liability coverage is contrary to *W.Va.Code*, 33–6–31(a). But on a more general note, we believe that the inclusion of a

defense within limits provision in a governmental entity's insurance policy offends traditional notions of fairness. Governmental entities purchase liability insurance to protect their employees and to protect the public fisc. The quiet inclusion of a defense within limits provision into a governmental entity's liability policy subverts that intent by using the liability coverage to pay the insurance company's litigation expenses and attorney fees, rather than protecting the governmental entity and its employees and making injured third parties whole against their losses.

The circuit court's order in favor of the appellee must therefore be reversed, and the case remanded to permit the reformation of the policy so that it conforms with statutory motor vehicle insurance requirements.

### IV.

#### Conclusion

The circuit court's April 8, 2004 order is reversed, and the case is remanded for further proceedings.

Reversed and Remanded.

---

**12.** *W.Va.Code*, 23–2–1(a) [1995] stated, in part:
The state of West Virginia and all governmental agencies or departments created by it, including ... political subdivisions of the state ... are hereby required to subscribe to and pay premium taxes into the workers' compensation fund for the protection of their employees....

Certain employers—those with "sufficient capability and financial responsibility" to pay claims to injured employees and the dependents of fatally injured employees—could, upon a showing of a significant pool of financial resources to pay such claims, "self-insure" and not have to subscribe to the workers' compensation fund. *See W.Va.Code*, 23–2–9 [1995].