711 S.E.2d 260

**WEST VIRGINIA MEDICAL IMAGING AND RADIATION THERAPY TECHNOLOGY BOARD OF EXAMINERS, Petitioner Below, Petitioner**

v.

**Kenneth A. HARRISON, Respondent Below, Respondent.**

No. 101150.

Supreme Court of Appeals of West Virginia.

Submitted May 11, 2011.

Decided May 26, 2011.

---

Darrell V. McGraw, Nicole A. Cofer, Attorney General's Office, Charleston, WV, for Appellant.

Jacques R. Williams, Hamstead, Williams and Shook, Morgantown, WV, for Appellee.

PER CURIAM:

The West Virginia Medical Imaging and Radiation Therapy Technology Board of Examiners ("Board" or "Appellant") appeals the March 26, 2010, order of the Circuit Court of Monongalia County, which reversed the Board's Final Administrative Order suspending for two years Appellee Kenneth A. Harrison's license to practice medical imaging and radiation therapy technology in the State of West Virginia. The Board had found that Appellee practiced outside the scope of his medical imaging and radiation therapy technology license when he administered intravenous medication to a patient without physician involvement, in violation of W.Va.Code

§ 30–23–1 *et seq.*[1] and 18 C.S.R. §§ 5–5.1 and 5.1.17.

Upon careful consideration of the arguments of the parties and the applicable legal authority, and for the reasons set forth below, we reverse the order of the circuit court.

I. Factual and Procedural Background

At all times relevant, Appellee was a radiologic technologist[2] licensed by the Board[3] and was employed in that capacity by West Virginia University Hospitals ("WVUH"). In a letter dated July 2, 2008, from Darlene S. Headley, Director, WVUH Department of Radiology, the Board was advised that Appellee's employment at WVUH had been terminated "due to unfavorable conduct for working outside of the scope of practice for a radiologic technologist at WVUH."[4] The letter further advised the Board that

[u]pon investigation of a patient care situation, [Appellee] admitted to administering Benadryl intravenously to a patient without physician involvement. The lack of a physician order and the lack of involvement of a physician, nurse or pharmacist in the dose calculation and administration of a medication are outside of the scope of practice for a radiologic technologist.

Thereafter, the Board notified Appellee that it was conducting an investigation into the matter and advised him of his right to respond, in writing, to the complaint and allegations that he was terminated by WVUH as set forth above. *See generally* W.Va.Code §§ 30–23–25 and 26 (2007).

On or about August 5, 2008, Appellee filed a written response with the Board in which he admitted administering Benadryl intravenously to a patient who had an allergic reaction to the contrast media.[5] It is undisputed that, prior to injecting the patient with contrast, neither Appellee nor his co-worker, radiologic technologist Ronna Shaneyfelt, were advised by the appropriate hospital staff that the patient had a contrast allergy. According to Appellee's written response to the Board's allegations, the patient had "an anaphylactic reaction" to the contrast. Appellee explained that the patient was "displaying hives and started to hiccup, which progressed rapidly into respiratory distress." Appellee's response further stated that the radiology resident on call failed to respond to his co-worker's page in a timely manner. According to Appellee, "[t]here was no formal written policy to cover such an event," and he "had to administer Benadryl and start [the patient] on oxygen due to his deteriorating respiratory status." Appellee believed he had done nothing wrong

because it is in my job description to handle medications on a daily basis. . . . We are required to have IV therapy classes and draw up medications all the time. As to the accusation that I did not have the guidance of a physician to determine the dose of Benadryl, she did not make herself available and technologists in this facility draw up medications all the time without the presence of the physician when making trays for special procedures, biopsies, and abscess drainages.

As to me not going to the [emergency department] for help, this is not what the procedure is. We are told to call the radiologist.

1. The events that transpired in this case occurred in June 2008. We note that portions of W.Va. Code § 30–23–1 *et seq.* were subsequently revised; however, because such revisions have no material impact on the resolution of this case, we shall refer to the revised and most recent statute for ease of reference.

2. A "radiologic technologist" is defined as "a person . . . who applies medical imaging or assists in the application of ionizing radiation to human beings for diagnostic or therapeutic purposes as prescribed by a licensed practitioner[.]" W.Va.Code § 30–23–4(s) (2009) (Repl.Vol.2007).

3. The Board is a statutorily-created agency empowered to regulate the practice of medical imaging and radiation therapy technology in the State of West Virginia. *See* W.Va.Code §§ 30–23–5 and 6 (2010).

4. Appellee became a radiologic technologist in 1986 and, prior to his termination, worked at WVUH for approximately six years.

5. It was explained during the course of the January 29, 2009, hearing that contrast media is "an ionic or non-ionic material that is injected [intravenously into patients] so that certain organs can be imaged more clearly."

Pursuant to a Notice of Hearing and Statement of Charges dated December 11, 2008, an administrative hearing was conducted on January 29, 2009, and April 2, 2009, before Hearing Examiner Jack C. McClung. During the course of the hearing, Ms. Shaneyfelt testified that after the patient had been injected with contrast and scanned, she read in his chart that he was allergic to contrast. According to Ms. Shaneyfelt, she went from the control room to the scanner area to ask Appellee if he was aware of the patient's allergy. Appellee did not answer but instead left the room.[6] Ms. Shaneyfelt attended to the patient and noticed that, at most, he had two or three hives on his neck. Ms. Shaneyfelt testified that "the patient did not seem to be in any distress," and that she did not "see any respiratory issues arising from it or anything like that." When she asked the patient if he was okay, he nodded affirmatively. Ms. Shaneyfelt immediately paged Dr. Mithra Kimyai–Asadi, the radiology resident on call. Meanwhile, at the same time Appellee returned to the patient, Dr. Kimyai–Asadi answered Ms. Shaneyfelt's page and advised her that she would be right there. A few minutes later, Dr. Kimyai–Asadi arrived[7] and she and Ms. Shaneyfelt approached the area where the Appellee was attending to the patient and listening to his lungs with a stethoscope. It was at that time Ms. Shaneyfelt heard Appellee say that he had administered 50 mg of Benadryl intravenously to the patient.[8]

Dr. Kimyai–Asadi testified that when she answered Ms. Shaneyfelt's page regarding the patient's allergic reaction, she did not advise Ms. Shaneyfelt that someone should administer Benadryl.[9] Although Dr. Kimyai–Asadi testified that, ultimately, administering 50 mg of Benadryl was appropriate in this case, whether to administer the medication was her decision to make:

Q. Now you have said and I think you have concluded that everyone agrees that [administering 50 mg of Benadryl] was the right thing to do ultimately.

A. Uh-huh (yes).

Q. In your opinion, whose call should that have been to make?

A. Mine

Q. Would you see a reason for a [radiologic technologist] to make that call for you?

A. Maybe in extreme circumstances, I mean, but then it wouldn't be Benadryl. If it was extreme and the guy was coding, it wouldn't be Benadryl. But probably not then. I mean, something like hives can wait. And if it was something like respiratory distress, then we would probably call a code and not give Benadryl.

For his part, Appellee testified that although Ms. Shaneyfelt paged Dr. Kimyai–Asadi after the patient began to break out into hives, Ms. Shaneyfelt led him to believe that no physician was coming to help them

---

**6.** Appellee left the room in order to retrieve the Benadryl, a fact of which Ms. Shaneyfelt was unaware at the time.

**7.** Contrary to Appellee's assertion in his written response to the Board's allegations that "the Radiologist did not respond in a timely manor [sic] to this crisis," and that Ms. Shaneyfelt paged her more than once, Ms. Shaneyfelt testified that Dr. Kimyai–Asadi returned the page and arrived on the scene all within "a matter of no more than five minutes" from the time she was first paged.

**8.** When Ms. Shaneyfelt was asked at "what level would it have to have been in order for you to feel comfortable pushing Benadryl without first contacting a doctor or making sure that someone else had been alerted prior[,]" she replied as follows:

It wouldn't be at any level that I would push any drug. I don't have that authority to do that. Two reasons; [sic] number one, I didn't

have an order; number two I am not an RN which pushes drugs. You know, we cannot, in my area of practice we do not push drugs unless—we do push the IV contrast. We do push the saline. But that's within our protocol of our field to do it. But to push the drugs, in my opinion, no, I would not. I don't have that power to do that.

Ms. Shaneyfelt further testified that she was so bothered by Appellee's decision to administer IV Benadryl in this situation that, when she returned home after work that evening, she telephoned the lead technologist to speak with her about the incident.

**9.** Dr. Kimyai–Asadi further testified that, likewise, she had not previously given orders to the radiologic technologists that, in the event of an emergency, they should administer Benadryl before or while paging her.

deal with the situation that had just developed. Meanwhile, Appellee observed the patient begin to hiccup and to have "some labored breathing[,]" at which time Appellee told Ms. Shaneyfelt he was going to get some Benadryl.[10] Appellee testified that he administered intravenous Benadryl to the patient "because he kept deteriorating." Shortly after Appellee administered the medication, Dr. Kimyai–Asadi arrived.

Following the incident, Appellant wrote up a report in which he documented what occurred: "Patient was given 50 mg of Benadryl IV for a contrast allergy induced rash.... After Benadryl was given patient's rash started to disapate [sic]." Nowhere in the report did Appellee document that the patient was also experiencing respiratory distress and hiccups.

Appellee also presented evidence that at the time the foregoing incident occurred, WVUH had in place a protocol which, he argued, authorized radiologic technologists to administer Benadryl intravenously in the event a patient experienced an allergic reaction to contrast. More specifically, admitted into evidence was a "protocol excerpt" entitled "Intravenous Contrast Allergy," which provided, in relevant part, as follows:

If the patient develops a mild to moderate allergic reaction with the injection:

i. Notify the radiology resident and/or attending.

ii. **If the allergic reaction is hives, rash, redness or itching, the treatment is Benadryl 50 mgm IV or PO.**

iii. Observe the patient for 30 to 60 minutes until hives or rash begin to resolve. If the patient has someone to drive, he or she may leave. If no driver is available, check with the radiology resident or attending regarding a time frame for discharge.

iv. The patient must be seen by a physician prior to discharge, and must be given a copy of the contrast reaction discharge instructions, which must be signed by the patient and by the physician.

\*　　\*　　\*

If the patient develops a severe allergic reaction or anaphylactic reaction with the current injection:

i. Notify radiology resident/attending. Initial treatment is Benadryl 50 mgm IV, SoluMedrol 125 mgm IV, and Epinephrine 1:1000, 0.3 ml subcutaneously. The patient is then transferred to the Emergency Department.

(Emphasis added)

When asked at the hearing how he knew what dosage of Benadryl to administer, Appellee replied, "it's in our protocol manual, of course. But over the years, you know, you work around radiology for so long and radiologists have you draw up medications for them.... And, of course, with my training and my pharmacology courses, I knew appropriate dose [sic] for a patient, given heights and weights." [11]

---

10. Appellee's testimony differed somewhat from that of Ms. Shaneyfelt. As indicated previously, according to Ms. Shaneyfelt's testimony, she approached the patient after Appellee left him to retrieve the Benadryl and, contrary to Appellee's testimony, she observed only two to three hives on the patient's neck and did not find him to be in any respiratory distress. Furthermore, Ms. Shaneyfelt testified that Appellee did not indicate where he was going or what he was doing when he briefly left the patient in the scanning area. Ms. Shaneyfelt did not recall telling Appellee that no one was coming to help them. As indicated above, Ms. Shaneyfelt, Appellee and Dr. Kimyai–Asadi all testified that Dr. Kimyai–Asadi answered her page and arrived on the scene all within a total of five minutes.

11. Radiologic technologist Kenneth Bragg, Appellee's co-worker at WVUH, testified that if he had a patient who developed an allergic reaction to contrast, he would feel authorized to administer Benadryl intravenously pursuant to the above-quoted "protocol excerpt." Although he believed that he has "the clinical and didactic education and background to push medications into patients[,]" Mr. Bragg admitted that he has never administered Benadryl to patients who have had allergic reactions to contrast. To the contrary, Mr. Bragg stated that in such cases, "the doctors usually were there, or you automatically shoved the patient into the ER and they dealt with it, if you didn't call a code. You know, they would come into the room and deal with it as far as that." Mr. Bragg testified that radiologic technologists do not order medications nor do they have the ability to do so.

**444**

Ms. Headley, the administrative director of the hospital's Radiology Department,[12] testified that in her position at WVUH, she reviews all protocols before they are adopted and that she never signed off on any protocol which would permit a radiologic technologist to administer drugs, either intravenously or intramuscularly, that are not prescribed or ordered by a physician. The foregoing "protocol excerpt" had been found in two of the hospital's five scanner rooms. It consisted of two pieces of paper that had been cut from another, unidentified document and placed in a plastic sleeve.[13] Ms. Headley testified that it was "unusual" for pieces of paper to be cut out and put into a sleeve as this "protocol excerpt" was and, indeed, she was not sure where this one originated. She further testified that, in her opinion, the above-quoted "protocol excerpt" in no way directed a radiologic technologist to administer any sort of non-contrast drug without a physician's order. According to Ms. Headley, "[t]hese protocols would never supercede the need for a physician's order or a physician to be present." Although she could not point to any state law or Board regulation expressly prohibiting a radiologic technologist from administering medication without physician involvement, Ms. Headley testified that it is hospital policy that

> the technologist identify a concern and contact a radiologist. The radiologist or an RN under the direction of a radiologist can administer medications. If the patient warrants significant assistance or has trouble breathing or is in some way in need of emergency care, you can call a code or you can get other medical professionals involved.

In Ms. Headley's opinion, radiologic technologists do not have the proper training to prescribe or administer medications without a doctor's order.

The Hearing Examiner's Recommended Decision concluded that Appellee's "administering an injection of medication without the involvement of a physician constitutes practicing outside the scope of his Medical Imaging and Radiation Therapy Technology license, which is in violation of West Virginia Code § 30–23–1 et seq., and the West Virginia Code of State Rules § 18–5–5.1.17."[14] In so concluding, the Hearing Examiner relied on, inter alia, W.Va.Code § 30–23–10(10) (2009), concerning the Scope of Practice for a Radiologic Technologist, which includes " '[a]dministering contrast media after consultation with, and under the supervision of, a physician who is immediately and physically available.' " The Hearing Examiner reasoned that

> [b]ecause the law speaks specifically to the one drug that radiologic technologists are permitted to administer, stating that contrast media requires consultation with a physician, it can be reasonably inferred that [Appellee] would have minimally needed an order from a physician before administering a drug outside of that specifically permitted, like Benadryl. Therefore, [Appellee's] admitted independent administration of IV Benadryl without any involvement from a physician is a violation of the laws as they pertain to the scope of practice of Radiologic Technology.

The Board adopted the Hearing Examiner's Recommended Decision and entered a Final Administrative Order on September 25, 2009, suspending Appellee's license for two

12. Ms. Headley is also a radiologic technologist.

13. In each of the five scanner rooms at WVUH, there is a protocol book available for reference and use by radiologic technologists when performing scans. The protocol books provide information such as the amount of contrast to be injected based on the body part or organ being scanned; the proper IV size; and the rate a radiologic technologist should be shooting contrast.

14. 18 C.S.R. § 5 generally concerns the Standard of Ethics applicable to licensed Radiologic

Technologists. The "Standard of Ethics consists of the Standard of Practice and the Code of Ethics." 18 C.S.R. § 5–1.1. The Code of Ethics, set forth in 18 C.S.R. § 5–5.1, "is intended to promote the protection, safety and comfort of patients." Individuals who engage in certain enumerated conduct or activities "have violated the Code of Ethics and could be subject to sanctions." Id. In the case sub judice, the Board found that Appellee "practice[d] outside the scope of practice authorized by the individual's current state permit or license[.]" 18 C.S.R. § 5–5.1.17.

years followed by a three-year probationary period.[15]

On appeal, the Circuit Court of Monongalia County reversed the Board's Final Administrative Order in an order entered March 26, 2010. In its Opinion Order Reversing Administrative Order, the circuit court determined that

> in light of the fact that (1) the record shows that there are no relevant regulations, code sections, or institutional policies that expressly prohibit [radiologic technologists] from administering Benadryl intravenously; and (2) that there is an applicable, but vague, institutional policy that could reasonably lead [radiologic technologists] to believe they are authorized to intravenously administer Benadryl when a patient develops a 'mild to moderate allergic reaction' to Contrast, this Court finds that the Hearing Examiner's conclusion of law—that [Appellee] violated the laws as they pertain to the scope of practice of Radiologic Technology and was thus acting outside the scope of his practice—is clearly wrong in view of the reliable, probative, and substantial evidence on the whole record.

It is from the circuit court's March 26, 2010, order that the Board now appeals.

## II. Standard of Review

■ The Board's decision to suspend Appellee's medical imaging and radiation therapy technology license was subject to the "contested cases" provision of this state's Administrative Procedures Act, W.Va.Code § 29A–5–1 *et seq. See* W.Va.Code § 29A–5–4(a) (1998) (2007 Repl. Vol.) and W.Va.Code § 30–23–26(e) (2007). The standard of review of administrative proceedings by a circuit court is well settled and consistent with the language of W.Va.Code § 29A–5–4(g):

> " 'Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings.

The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law, or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.' Syllabus point 2, *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983)." Syllabus, *Berlow v. West Virginia Board of Medicine*, 193 W.Va. 666, 458 S.E.2d 469 (1995).

Syl. Pt. 1, *Modi v. West Virginia Bd. of Medicine*, 195 W.Va. 230, 232, 465 S.E.2d 230, 232 (1995).

■ Upon appeal of a contested case,
[a] reviewing court must evaluate the record of an administrative agency's proceeding to determine whether there is evidence on the record as a whole to support the agency's decision. The evaluation is conducted pursuant to the administrative body's findings of fact, regardless of whether the court would have reached a different conclusion on the same set of facts.

Syl. Pt. 1, *Walker v. West Virginia Ethics Com'n*, 201 W.Va. 108, 109–10, 492 S.E.2d 167, 168–9 (1997). *See Frank's Shoe Store v. West Virginia Human Rights Comm'n*, 179 W.Va. 53, 56, 365 S.E.2d 251, 254 (1986). This Court has stated that " '[t]he "clearly wrong" and the "arbitrary and capricious" standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis.' Syl. Pt. 3, *In re Queen*, 196 W.Va. 442, 473 S.E.2d

---

**15.** Appellee was also ordered by the Board, *inter alia,* to pay the costs and fees associated with the underlying proceedings and to complete continu-ing education credits under conditions specifically set forth in the Board's order.

483 (1996)." *Webb v. West Virginia Bd. of Medicine,* 212 W.Va. 149, 155, 569 S.E.2d 225, 231 (2002).

■ Further appeal may be had to this Court after entry of a final order by the circuit court, pursuant to W.Va.Code § 29A-6-1 (1964).[16] The circuit court order appealed herein reversed the Board's decision that Appellee practiced outside the scope of his medical imaging and radiation therapy technology license when he administered intravenous medication to a patient without physician involvement. " ' "In cases where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law de novo." Syl. pt. 2, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996).' Syllabus point. 1, *Hoover v. West Virginia Board of Medicine,* 216 W.Va. 23, 602 S.E.2d 466 (2004)." Syl. Pt. 1, *Crouch v. West Virginia Div. of Motor Vehicles,* 219 W.Va. 70, 71, 631 S.E.2d 628, 629 (2006).

With these standards in mind, we shall consider the issue raised in the Board's appeal.

### III. Discussion

■ At issue in this appeal is whether the circuit court improperly substituted its judgment for that of the Board with regard to whether Appellee acted outside the scope of practice for a radiologic technologist when he administered Benadryl intravenously to a patient without the involvement of a physician. The circuit court concluded that the Board was clearly wrong in view of the reliable, probative and substantial evidence on the whole record because (1) "there are no relevant regulations, code sections, or institutional policies that expressly prohibit [radiologic technologists] from administering Benadryl intravenously;" and (2) the "protocol excerpt" was "vague" and "could reasonably lead [radiologic technologists] to believe they are authorized to intravenously administer Benadryl when a patient develops a 'mild to moderate allergic reaction' to Contrast[.]"

■ In "the interest of public health," the Legislature determined that "a person performing medical imaging or radiation therapy technology in this State shall be licensed[,]" W.Va.Code § 30-23-1(2) (1977), and, to that end, set forth eligibility requirements for a radiologic technology license, W.Va.Code § 30-23-9 (2009), and outlined the scope of practice for a radiologic technologist. W.Va. Code § 30-23-10 (2009). Pursuant to W. Va.Code § 30-23-10, the scope of practice of a Radiologic Technologist includes, in relevant part, the following:

(10) Administering contrast media after consultation with, and under the supervision of, a physician who is immediately and physically available; [and]

(11) Maintaining values congruent with the profession's Code of Ethics and scope of practice as well as adhering to national, institutional and/or departmental standards, policies and procedures regarding delivery of services and patient care[.]

■ W.Va.Code § 30-23-10(10) speaks specifically to contrast media—the one drug that radiologic technologists are permitted to administer in connection with their regular duties as a radiologic technologist—and requires that it be administered only "after consultation with, and under the supervision of, a physician who is immediately and physically available." Nowhere in W.Va.Code § 30-23-10 does it authorize radiologic technologists to administer any other type of medication, including Benadryl, without physician involvement. This Court has previously recognized that " '[i]n the interpretation of statutory provisions the familiar maxim *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of another, applies.' Syllabus Point 3, *Manchin v. Dunfee,* 174 W.Va. 532, 327 S.E.2d 710 (1984)." Syl. Pt. 6, *Phillips v. Larry's Drive–In Pharmacy, Inc.,* 220 W.Va.

---

**16.** W.Va.Code § 29A-6-1 (1964) provides:
  Any party adversely affected by the final judgment of the circuit court under this chapter may seek review thereof by appeal to the Supreme Court of Appeals of this State, and jurisdiction is hereby conferred upon such court to hear and entertain such appeals upon application made therefor in the manner and within the time provided by law for civil appeals generally.

484, 486, 647 S.E.2d 920, 922 (2007). " 'This doctrine informs courts to exclude from operation those items not included in the list of elements that are given effect expressly by statutory language.' " *Gibson v. Northfield Ins. Co.*, 219 W.Va. 40, 47, 631 S.E.2d 598, 605 (2005) (internal citation omitted). Thus, in the absence of any statutory language that it is within the scope of practice for a radiologic technologist to administer medications other than contrast media, this Court finds that the circuit court's conclusion otherwise was in error.

■ We next address the circuit court's conclusion that, pursuant to W.Va.Code § 30–23–(10)(11), the "protocol excerpt," though "vague," constituted some sort of institutional policy at WVUH to which Appellee adhered when he administered the Benadryl intravenously to his patient. As indicated above, W.Va.Code § 30–23–10(11), provides that a radiologic technologist's scope of practice includes " '[m]aintaining values congruent with the profession's Code of Ethics and scope of practice as well as adhering to national, *institutional* and/or departmental standards, policies and procedures regarding delivery of services and patient care[.]' " (Emphasis added). It is the Board's argument that the circuit court improperly concluded that the "protocol excerpt" "could reasonably lead [radiologic technologists] to believe they are authorized to intravenously administer Benadryl when a patient develops a 'mild to moderate allergic reaction' to Contrast[.]" We agree with the Board's argument and find the circuit court's conclusion was in error.

First, Appellee failed to adequately establish that the "protocol excerpt" had been adopted by WVUH as an institutional policy authorizing radiologic technologists to administer Benadryl without physician involvement in the event a patient experienced an allergic reaction to contrast. Ms. Headley testified that in her capacity as director of the radiolo-

gy department, she reviews all protocols before they are adopted and that she never signed off on any protocol which would permit a radiologic technologist to administer medications not prescribed or ordered by a physician. Indeed, she was unable to determine from where the "protocol excerpt" at issue originated, testifying it was "unusual" for it to have been cut from another, unidentified document and placed in a plastic sleeve in only two of the hospital's scanner rooms. She indicated that it is hospital policy that in the event a patient experiences an allergic reaction to contrast, radiologic technologists are to contact a radiologist and, contrary to any purported institutional policy stating otherwise, the "radiologist or an RN under the direction of a radiologist can administer medications." Ms. Headley further testified that if the patient has trouble breathing, which Appellee testified occurred in this case, the radiologic technologist is to call a code. Thus, according to Ms. Headley, the "protocol excerpt's" language that, "[i]f the allergic reaction is hives, rash, redness or itching, the treatment is Benadryl 50 mgm IV or PO," does not direct or authorize radiologic technologists to administer the drug. Indeed, it was Ms. Headley's testimony that radiologic technologists do not have the proper training to either prescribe or administer medications.[17]

Additionally, from our review of the record, this Court is not persuaded that Appellee himself believed the "protocol excerpt" authorized him to administer Benadryl intravenously in this case. In his written response to the Board's allegations that he acted outside the scope of his practice as a radiologic technologist, Appellee stated that there was "no formal written policy to cover" the events that transpired; he further admitted that the procedure at WVUH is "to call the radiologist." During the course of the hearing, Appellee testified that he knew what dosage of Benadryl to administer based upon

---

**17.** Assuming *arguendo* that the "protocol excerpt" constituted an institutional policy at WVUH which authorized radiologic technologists to administer Benadryl without physician involvement, the facts as recounted by Appellee establish that he failed to properly follow it. According to Appellee, the patient had an anaphylactic reaction to the allergy contrast, developing hives and respiratory distress. The

"protocol excerpt" directs that "[i]f the patient develops a severe allergic or anaphylactic reaction ... Notify radiology resident/attending. Initial treatment is Benadryl 50 mgm IV, Solu-Medrol 125 mgm IV, and Epinephrine 1:1000, 0.3 ml subcutaneously. The patient is then transferred to the Emergency Department." It is undisputed that Appellee failed to follow this protocol.

the "protocol excerpt" but also because, "over the years, you know, you work around radiology for so long and radiologists have you draw up medications for them.... And of course, with my training and my pharmacology courses, I knew appropriate doses for a patient, given heights and weights." While Appellee may have learned the appropriate dosage information from the "protocol excerpt," it was not at all clear from the evidence that he believed the "protocol excerpt" authorized him to administer that dosage to his patient.

Based upon the above, this Court finds that the circuit court abused its discretion in reversing the Board's Final Administrative Order, which properly concluded that Appellant practiced outside the scope of his medical imaging and radiation therapy technology license, in violation of W.Va.Code § 30–23–1 *et seq.* and 18 C.S.R. §§ 5–5.1 and 5.1.17, and which suspended Appellee's license for a period of two years, as set forth in the Board's order. *See* Syl. Pt. 1, *Crouch, supra.*

### IV. Conclusion

For the reasons stated herein, the Opinion Order Reversing Administrative Order, entered in the Circuit Court of Monongalia County, on March 26, 2010, is hereby reversed.

Reversed.