IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

_____

No. 20-0308

_____

FILED
June 11, 2021
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

AMEDISYS WEST VIRGINIA, LLC dba AMEDISYS HOME HEALTH OF WEST
VIRGINIA, ST. MARYS MEDICAL CENTER HOME HEALTH SERVICES, LLC, and
LHC GROUP, INC., Petitioners Below, Petitioners

v.

PERSONAL TOUCH HOME CARE OF W.VA., INC. et al., and THE WEST
VIRGINIA HEALTH CARE AUTHORITY, Respondents Below, Respondents

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Tod J. Kaufman, Judge
Civil Action No. 19-AA-145

AFFIRMED
_____

AND

_____

No. 20-0401

_____

PRESTON MEMORIAL HOMECARE, LLC, et al.,
Petitioners, Below, Petitioners

v.

UNITED HOSPITAL CENTER, INC., and THE WEST VIRGINIA HEALTH CARE
AUTHORITY, Respondents Below, Respondents

_____

Appeal from the Circuit Court of Kanawha County

The Honorable Carrie L. Webster, Judge
Civil Action No. 18-AA-228

AFFIRMED

_____

Submitted: April 13, 2021
Filed: June 11, 2021

Robert L. Coffield, Esq.
Caleb P. Knight, Esq.
Flaherty Sensabaugh Bonasso PLLC
Charleston, West Virginia
Counsel for Petitioners

Thomas G. Casto, Esq.
Anna G. Casto, Esq.
Lewis Glasser PLLC
Charleston, West Virginia
Counsel for Respondent Personal
Touch Home Care of W.Va., Inc.

James W. Thomas, Esq.
Neil C. Brown, Esq.
Jackson Kelly, PLLC
Charleston, West Virginia
Counsel for Respondent United
Hospital Center, Inc.

Patrick Morrisey, Esq.
Attorney General
B. Allen Campbell, Esq.
Senior Assistant Attorney General
Charleston, West Virginia
Counsel for Respondents West
Virginia Health Care Authority and
Department of Health and Human
Resources

JUSTICE WOOTON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.          ""''"Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law, or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.' Syllabus point 2, *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983)." Syllabus, *Berlow v. West Virginia Board of Medicine,* 193 W.Va. 666, 458 S.E.2d 469 (1995).' Syl. Pt. 1, *Modi v. West Virginia Bd. of Medicine,* 195 W.Va. 230, 465 S.E.2d 230 (1995)."  Syl. Pt. 1, *W. Va. Med. Imaging & Radiation Therapy Tech. Bd. of Exam'rs v. Harrison*, 227 W. Va. 438, 711 S.E.2d 260 (2011).

2.          "'Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative

i

agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage.' Syl. Pt. 3, *Appalachian Power Co. v. State Tax Dep't of W. Virginia*, 195 W. Va. 573, 466 S.E.2d 424 (1995)." Syl. Pt. 5, *Murray Energy Corp. v. Steager*, 241 W. Va. 629, 827 S.E.2d 417 (2019).

3. "'If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va. Code, 29A–4–2 (1982).' Syl. Pt. 4, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995)." Syl. Pt. 6, *Murray Energy Corp. v. Steager*, 241 W. Va. 629, 827 S.E.2d 417 (2019).

ii

4.    "'Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review.' Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995)." Syl. Pt. 2, *Steager v. Consol. Energy, Inc.*, 242 W. Va. 209, 832 S.E.2d 135 (2019).


5.    Where the State Health Plan Home Health Services Standards were promulgated by the West Virginia Health Care Authority (formerly the West Virginia Health Care Cost Review Authority) pursuant to a legislative grant of authority, West Virginia Code §§ 16-2D-1 to -20 (2016 & Supp. 2020), authorized by the Governor, and formally adopted and given full force and effect by the Legislature, *see id*. § 16-2D-6(g), the longstanding, consistent interpretation of those Standards by the West Virginia Health Care Authority, being neither arbitrary nor capricious, is entitled to judicial deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

WOOTON, J.:

In these consolidated cases we are called upon to examine the State Health Plan Home Health Services Standards ("the Standards"), which were promulgated by respondent West Virginia Health Care Cost Review Authority ("HCCRA"), now the West Virginia Health Care Authority ("the Authority"), as part of its duties and responsibilities pursuant to West Virginia Code §§ 16-2D-1 to -20 (2016 & Supp. 2020). The Standards were approved by the Governor on November 13, 1996. The Standards govern the Authority's consideration of applications from individuals and entities seeking to provide home health care services in a particular county, and include, inter alia, a methodology for determining whether there is an unmet need for such services in the county. If the Authority determines that an applicant has demonstrated the existence of unmet need and has otherwise satisfied all other requirements imposed by the Standards, the agency issues a Certificate of Need ("CON") allowing the applicant to offer services in the county.

Petitioners Amedisys West Virginia, L.L.C. dba Amedisys Home Health of West Virginia, St. Marys Medical Center Home Health Services, LLC, and LHC Group, Inc. ("the Amedisys petitioners") and petitioners Preston Memorial Homecare, LLC and Tender Loving Care Health Care Services of West Virginia, LLC dba Amedisys Home Health of West Virginia ("the Preston Memorial petitioners") (referred to collectively as "petitioners") contend that unmet need cannot be established unless the evidence shows that at least 229 individuals in the county in question are in need of home health care services. Respondents Personal Touch Home Care of W. Va., Inc. ("Personal Touch"),

1

United Hospital Center, Inc. ("United"), and The West Virginia Health Care Authority ("the Authority") (referred to collectively as "respondents") counter that in an unbroken line of precedents dating back at least to 2002, the Authority's position has been that any number of individuals in need of the services – whether it's 1 or 100 or 1,000 – can be deemed sufficient to establish unmet need in the county. According to respondents, the 229 figure is an average county usage figure that comes into play only where another home health care provider has begun offering services in the county during the preceding 12-month period; in such case, the Standards require the new applicant to demonstrate a need at or beyond the 229 average usage figure, a requirement intended to give the recently established provider sufficient time to develop and grow its business before having to compete with a newcomer.

With this background in mind, we turn to the factual and procedural posture in these consolidated cases and then examine the single, dispositive issue presented in both. After review, and for the reasons explained herein, the decisions of the circuit court in No. 20-0308 and No. 20-0401 are affirmed.

## I. Facts and Procedural Background

No. 20-0308

In the first case, the Amedisys petitioners contend that a CON issued by the Authority to respondent Personal Touch was improper in that Personal Touch failed to

2

demonstrate the requisite unmet need for additional home health services in Cabell and Wayne Counties.

On August 10, 2018, Personal Touch filed its application for a CON allowing it to expand its existing home health care services into Cabell and Wayne Counties. *See id*. § 16-2D-8(b)(23). In this regard, "[a] certificate of need may only be issued if the proposed health service is: (1) Found to be needed; and (2) Consistent with the state health plan, unless there are emergency circumstances that pose a threat to public health." *See id*. § 16-2D-12(a). According to the calculations contained in the application filed by Personal Touch, which followed the methodology contained in Section V(C)(1) – (3) of the Standards,[1] the unmet need for home health care services was 29 individuals in Cabell County and 55 individuals in Wayne County.

On August 14, 2018, the application was deemed complete, *see id*. § 16-2D-13(c), and two days later, on August 16, 2018, the Authority issued a Notice of Review.

---

[1] The methodology actually contains four calculations: the first compares the county and state home health utilization rates; the second determines the number of potential home health care recipients needed to reach the state rate; the third determines the actual number of home health care recipients below the state rate; and the fourth, which comes into play only where there are agencies in the county which received CON approval within the previous 12 months, applies an adjustment factor to determine unmet need. *See* text *infra* for a detailed discussion of these calculations. *See* Standards, V(C)(1) – (4), "Determining Unmet Need for Home Health Services." Because none of the existing home health services providers in either Cabell County or Wayne County had received a CON during the 12-month period preceding Personal Touch's application, *see* text *infra*, the fourth calculation was not applicable.

*See id.* § 16-2D-13(d). Thereafter, the Amedisys petitioners sought recognition as "affected persons," statutorily defined in relevant part as "health care facilit[ies] located within this state which provide services similar to the services of the facility under review and which will be significantly affected by the proposed project." *See id*. § 16-2D-2(1)(E). Of particular relevance to this case, it is important to note that all existing home health care providers in Cabell and Wayne County,[2] including the Amedisys petitioners, had been providing such services for more than 12 months preceding Personal Touch's application for a CON.

On December 12, 2018, a public hearing was held to determine whether the application of Personal Touch for a CON, which would allow it to expand its services into the counties in question, should be granted or denied by the Authority. To establish their case as affected parties, the Amedisys petitioners called Charles G. Gibbs, a health care consultant who was recognized as an expert in the field, to testify on their behalf. Mr. Gibbs took issue with the Personal Touch application in three respects. First, he contended that Personal Touch had based its unmet need calculations on 3-year-old data from fiscal year 2015, rather than on updated data from fiscal year 2017 which had been made publicly available on July 31, 2018, 10 days before Personal Touch filed its application.[3] In this

_____

[2] The record discloses that during the relevant time period, there were ten home health care providers in Cabell County and eleven in Wayne County.

[3] *See* text *infra*.

4

regard, Mr. Gibbs noted that the form used for applying for a CON specifies that "readily available data" be used and argued that the updated data was readily available in time to have been incorporated into the application. Second, Mr. Gibbs argued that Personal Touch had applied the wrong methodology for determining unmet needs in Cabell and Wayne County, in that it failed to apply the adjustment factor contained in section V(C)(4) of the Standards. *See supra* note 1. Mr. Gibbs acknowledged that the methodology utilized by Personal Touch comported with the Authority's longstanding interpretation of the Standards, specifically, that the adjustment factor came into play only in situations where other agencies in a county had received CON approval within the past 12 months.[4] He argued, however, that the Authority's interpretation was wrong. In that regard, he testified that before the Standards were adopted in their final form, HCCRA had developed a sample application form that applied the adjustment factor in all cases, not just in the limited

---

[4] Evidence submitted at the hearing demonstrated that CON approval had been given in 2002 for provision of home health services where the unmet need in Wayne County was 69 patients; again in 2002 where the unmet need in Wayne County was 75 patients; in 2003 where the unmet need in Jackson County was 127 patients, the unmet need in Putnam County was 386 patients, and the unmet need in Lincoln County was 97 patients; again in 2003 where the unmet need in Boone County was 125 patients, the unmet need in Cabell County was 5 patients, the unmet need in Lincoln County was 98 patients, the unmet need in Logan County was 180 patients, and the unmet need in Wyoming County was 212 patients; in 2004, where the unmet need in Berkeley County was 195 patients; again in 2004, where the unmet need in Wyoming County was 76 patients; in 2008, where the unmet need in Lincoln County was 30 patients, and the unmet need in Wayne County was 19 patients; in 2015, where the unmet need in Berkeley County was 961 patients, the unmet need in Hampshire County was 203 patients, the unmet need in Jefferson County was 606 patients, the unmet need in Morgan County was 116 patients, and the unmet need in Mineral County was 130 patients; in 2017, where the unmet need in Pleasants County was 8 patients, and the unmet need in Tyler County was 6 patients.

situation set forth above. He further testified that in 1997, two CON applications that had been decided by HCCRA[5] had specifically referred to, and applied, the 229 figure as a threshold, not an adjustment, although he acknowledged that at least since 2002, the Authority had consistently taken the opposite position. Mr. Gibbs further testified to the fact that on January 11, 2010, another health care expert, Raymona Kinneberg, then-advisor to the Authority's Certificate of Need Director, wrote a letter in which she expressed agreement with Mr. Gibbs' opinion, stating that "no new agencies should be approved in a county where the number of unserved patients was below the threshold set in the standards, whether or not a new agency had been approved in the previous year."[6] Mr. Gibbs also opined that what he deemed to be the Authority's "mistake" – failing to recognize that the adjustment factor should be applied in all cases – has been perpetuated in large part by the Authority's failure to "consider adjusting the threshold adjustment factor at the time it updates the need calculations[,]"[7] in the 25 years which have elapsed since the Standards were established. Finally, Mr. Gibbs noted that in 2007, in a CON

---

[5] *In re: Pro Careers, Inc.*, CON File No. 96-3/9-5726-Z (Mar. 17, 1997); *In re: Critical Care Nursing Agency, Inc.*, CON File No. 96-2/3-5790-Z/Z (Mar. 20, 1997).

[6] Ms. Kinneberg, who later became president of United, now holds a contrary view. *See* text *infra*.

[7] It appears that Mr. Gibbs' reference to updating "the needs calculations" was not a reference to the structure of the methodology, which has never been updated, but to the population data which is incorporated into the methodology. Although the record is not entirely clear on this point, it appears that the methodology is updated every two years with new data. An applicant works from the population data contained in the latest "Home Health Care Methodology" that the Authority makes publicly available. *See* text *infra*.

6

appeal in the Circuit Court of Mason County,[8] the court had held that the Authority's interpretation of Section V(C) of the Standards "results in absurd and conflicting decisions" in that it would be possible "to approve an application where the projection of unmet need is between 1 and 228 available new patients and also deny one with the same projected result."[9] *See* text *infra*. Third, Mr. Gibbs testified that with the Amedysis petitioners and others already providing home health services in Cabell and Wayne Counties, consumers have adequate choice and no need for additional services. Therefore, in Mr. Gibbs' view, the status quo should be maintained.

On April 4, 2019, the Authority issued its Decision, approving Personal Touch's CON application, conditioned on Personal Touch's submission of annual reports for the first three years of operation showing "the actual utilization and revenue and expenses compared to the projections presented[.] In this regard, the Authority specifically concluded, in relevant part, that "[p]atients will continue to experience serious problems in obtaining care of the type proposed in the absence of the proposed project," that "[t]he project is consistent with the State Health Plan," and that "[t]he project will serve the medically underserved population." The Amedysis petitioners filed a timely Request for

---

[8] Effective March 30, 2017, all appeals from a decision of the Office of Judges in a case involving the grant or denial of a CON are filed in the Circuit Court of Kanawha County. *See id*. § 16-2D-16(f).

[9] *Pleasant Valley Hosp., Inc. v. W. Va. Health Care Auth. and Family Home Health Plus, Inc. dba Ohio Valley Home Health, Inc*., No. 06-AA-20, at p. 8 (Mason Cnty. Cir. Ct. Order dated Mar. 27, 2007).

7

Review by the Health Care Authority/Office of Judges, and on September 28, 2019, following briefing and argument, the administrative law judge determined "that the Authority did not err in approving the Personal Touch CON for home health services in Cabell and Wayne Counties," and affirmed the April 4, 2019, decision.

On October 23, 2019, the Amedysis petitioners filed an administrative appeal in the Circuit Court of Kanawha County. By order entered on February 28, 2020, the court affirmed the decision of the Office of Judges and specifically found that the "decision is correct and . . . the Authority did not err in approving the Personal Touch CON for home health services in Cabell and Wayne counties, West Virginia." This appeal followed.

No. 20-0401

In the second case, the Preston Memorial petitioners contend that a CON issued by the Authority to respondent was improper in that United failed to demonstrate unmet need for additional home health services in Preston County.

United is a 292-bed acute care hospital located in Harrison County, West Virginia. At the time of events relevant to this case, it was the only provider of inpatient and outpatient acute care in Harrison County, and provided a range of inpatient and outpatient acute care services in Doddridge County as well. Additionally, United provided hospital and home health services in Harrison County and surrounding areas, and provided home health care services in Barbour, Doddridge, Harrison, Lewis, Marion, Taylor, and

8

Upshur Counties. On July 17, 2017, United filed its application for a CON allowing it to expand its existing home health care services into Preston County. According to the calculations contained in the application filed by United, which followed the methodology contained in Section V(C) of the Standards, the unmet need for home health care services was 44 individuals in Preston County.

On July 18, 2017, the application was deemed complete, and on August 1, 2017, the Authority issued an Amended Notice of Review. Thereafter, the Preston Memorial petitioners sought recognition as "affected persons" and asked for a hearing. Once again, it is important to note that all 5 existing home health care providers in Preston County, including the Preston Memorial petitioners, had been providing services in Preston County for more than 12 months preceding the date of United's application.

On December 7, 2017, a public hearing was held to determine whether the application of United for a CON, which would allow it to expand its services into Preston County, should be granted or denied by the Authority. United put on testimony and evidence to support its contention that such expansion would be beneficial in a number of respects. First, because many Preston County patients are released from WVU hospitals with very complicated needs, home health services provided by United would provide continuity of care, immediate access to medical records which, in turn, would allow for better communication and coordination of services, and access to some of WVU hospitals' medical experts, particularly in the Heart and Vascular Institute. Additionally, United

9

noted that it takes home health services patients who would not be accepted by other providers, specifically, patients known to be noncompliant and "have a variety of issues that can negatively affect your quality scores because they use the emergency room, they get readmitted, they don't follow their diabetic diet, they don't take their medications."

United also presented testimony and evidence to support its contention that the proposed expansion of its home health services into Preston County was financially feasible, in large part by "help[ing] us to reduce readmissions . . . that cost approximately $2,600 per admission." Finally, of specific relevance to this appeal, United offered testimony and evidence to support its projection that in its first year of operation in Preston County, it would provide services to 44 patients whose need was currently unmet,[10] as well as to 56 patients shifted from other services already in operation in the county. Testimony on this issue was given by Raymona Kinneberg, President of United, who supported its contention that 44 unmet needs patients was sufficient to support its application for a CON, and that the adjustment factor of 229 unmet needs patients, *see* text *supra*, came into play only in situations where other agencies in a county had received CON approval within the past 12 months. Ms. Kinneberg acknowledged having once expressed a different opinion while she was serving as a consultant to the director of the State's certificate of need program, but testified that she had changed her view in consideration of two factors: first,

---

[10] During the relevant time period, the state home health services utilization rate was 25/1,000 residents; based on its population, Preston County's need was estimated to be 875, while its actual utilization was 832, leaving unmet need of 44. *See* text *infra*.

the long, consistent interpretation of the Standards by HCA; and second, the fact that utilizing the 229 figure as a threshold, rather than an adjustment, would mean that based on their respective populations, ten counties in West Virginia[11] would *never* have an unmet need sufficient to support a CON for any home health services provider to operate therein.

In response to United's evidentiary presentation, the Preston Memorial petitioners put on their own evidence and testimony, including, in relevant part, the testimony of Charles Gibbs. Mr. Gibbs made the same arguments as he made in the Amedisys proceedings with respect to the issue of unmet need: specifically, he contended that using the 229 figure as a threshold in all cases, rather than simply as an adjustment where an existing provider had received a CON within the past 12 months, balances "the need for enough providers . . . while recognizing the need to protect financial viability, the operational viability, and the quality viability . . . [by regulating] the proliferation of home health systems." In Mr. Gibbs' view, the position taken by United, and upheld by HCA, that an unmet need of 44, or even 1, is sufficient to authorize a CON, is "unreasonable, absurd and illogical." Mr. Gibbs also testified that the United project was not financially feasible, pointing out that United's own projections showed a $103,915 loss in 2018, a $96,860 loss in 2019, and a $88,639 loss in 2020, for a total loss of $289,414 over three

---

[11] Calhoun, Doddridge, Gilmer, Pendleton, Pleasants, Pocahontas, Tucker, Tyler, Webster, and Wirt.

years.[12]  Finally, Mr. Gibbs noted that United had provided no letters of support for its proposed expansion of home health services into Preston County.

On February 16, 2018, the Authority issued its Decision, approving United's CON application.  In this regard, the Authority specifically concluded, in relevant part, that "[p]atients will continue to experience serious problems in obtaining care of the type proposed in the absence of the proposed project," that "[t]he project is consistent with the State Health Plan," and that "[t]he project will serve the medically underserved population."  The Amedisys petitioners filed a timely Request for Review by the Health Care Authority/Office of Judges, and on  June 27, 2018, following briefing and argument, the administrative law judge determined "that the Authority did not err in approving the Personal Touch CON for home health services in Preston County," and affirmed the February 16, 2018, decision.

On July 24, 2018, the Preston Memorial petitioners filed an administrative appeal in the Circuit Court of Kanawha County.  By order entered on May 20, 2020, the

---

[12] United's evidence on this point was that expansion of its home health care services program into Preston County was economically feasible. In this regard, United's Chief Financial Officer testified that United had based its financial projections "on how its home health agency actually operates – as a single unit and not as distinct counties."  Based on the totality of the evidence, the Authority concluded that "[United] has the resources to cover any losses initially created by expanding its home health services to Preston County. The Authority finds that [United] has adequately addressed the Standards as they pertain to the financial feasibility of this project and this project is financially feasible."

court affirmed the decision of the Office of Judges and specifically found that the decisions of the Authority and the Office of Judges awarding a CON to United "were supported by substantial evidence on the whole record; were rendered in accordance with law; were not arbitrary or capricious; and did not constitute an abuse of discretion or clearly unwarranted exercise of discretion." This appeal followed.

## II.  Standard of Review

At the initial review level, West Virginia Code § 16-2D-16 provides, in relevant part, that an appeal is processed by the Office of Judges "in accordance with the provisions governing the judicial review of contested administrative cases in article five, chapter twenty-nine-a of this code." The specific standard of review both for the Office of Judges and, on appeal therefrom, the circuit court, is set forth in West Virginia Code § 29A-5-4(g) (2016):

> ""Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law, or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.' Syllabus point 2, *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights*

13

*Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983)."
Syllabus, *Berlow v. West Virginia Board of Medicine,* 193
W.Va. 666, 458 S.E.2d 469 (1995).' Syl. Pt. 1, *Modi v. West
Virginia Bd. of Medicine,* 195 W.Va. 230, 465 S.E.2d 230
(1995).

Syl. Pt. 1, *W. Va. Med. Imaging & Radiation Therapy Tech. Bd. of Exam'rs v. Harrison*,

227 W. Va. 438, 711 S.E.2d 260 (2011).

Of specific relevance to the instant case, where the petitioners are challenging

the legitimacy of HCA's interpretation of its own CON Standards, we have held that

"'[j]udicial review of an agency's legislative rule and
the construction of a statute that it administers involves two
separate but interrelated questions, only the second of which
furnishes an occasion for deference. In deciding whether an
administrative agency's position should be sustained, a
reviewing court applies the standards set out by the United
States Supreme Court in *Chevron U.S.A., Inc. v. Natural
Resources Defense Council, Inc*., 467 U.S. 837, 104 S. Ct.
2778, 81 L. Ed.2d 694 (1984). The court first must ask whether
the Legislature has directly spoken to the precise question at
issue. If the intention of the Legislature is clear, that is the end
of the matter, and the agency's position only can be upheld if
it conforms to the Legislature's intent. No deference is due the
agency's interpretation at this stage.' Syl. Pt. 3, *Appalachian
Power Co. v. State Tax Dep't of W. Virginia*, 195 W. Va. 573,
466 S.E.2d 424 (1995)."

Syl. Pt. 5, *Murray Energy Corp. v. Steager*, 241 W. Va. 629, 827 S.E.2d 417 (2019). If the

intention of the Legislature is not clear, or if the Legislature has not spoken to the specific

issue, this Court will then turn to the second of the two interrelated *Chevron* questions.

'If legislative intent is not clear, a reviewing court may not
simply impose its own construction of the statute in reviewing
a legislative rule.  Rather, if the statute is silent or ambiguous
with respect to the specific issue, the question for the court is

14

whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va. Code, 29A–4–2 (1982).' Syl. Pt. 4, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

Syl. Pt. 6, *Murray Energy Corp. v. Steager*, 241 W. Va. 629, 827 S.E.2d 417 (2019).

### III. Discussion

In West Virginia Code §§ 16-2D-1 to -20 (2016 & Supp. 2020), the West Virginia Legislature created the CON program, declaring it to be the State's public policy "[t]hat the offering or development of all health services shall be accomplished in a manner which is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the health services of the people of this state[,]" and further to "avoid unnecessary duplication of health services, and to contain or reduce increases in the cost of delivering health services." *See id*. § 16-2D-1(1). Jurisdiction to administer the CON program was vested in the Authority, *see id*. § 16-2D-3(a)(1), which was tasked, inter alia, with "[r]eview[ing] the state health plan, the certificate of need standards, and the cost effectiveness of the certificate of need program and make any amendments and modifications to each that it may deem necessary[.]" *See id*. § 16-2D-3(a)(2).

15

Pursuant to the statutory framework, certain health services, including home health services, must be reviewed and approved by the Authority before they may be offered to the public in the first instance or expanded into a new area or areas. A certificate of need may only be issued where the offering or expansion of services is "[f]ound to be needed; and . . . [c]onsistent with the state health plan, unless there are emergency circumstances that pose a threat to public health." *See id*. §§ 16-2D-12(a)(1), (2). In making the determination of whether a CON may be issued, the Authority utilizes Standards which were approved by the Governor and were thereafter in full force and effect from the date of the Governor's approval. *See id*. § 16-2D-6(g). Of note, the Legislature has formally adopted the Standards and given them "full force and effect." *See id*. § 16-2D-6(g).

In these consolidated cases, all parties agree that the respondents' applications for CONs allowing them to expand their existing home health care services into Cabell, Wayne, and/or Preston County, were required to be evaluated by the Authority under the existing Standards.[13] As part of the overall evaluations, the Agency reviewed whether the respondents had successfully demonstrated the existence of the respective counties'

---

[13] Petitioners are highly critical of the fact that the Authority has made no changes to the Standards, and particularly Section V(C) thereof, since November 13, 1996, the date on which the Standards were approved by the Governor. However, although there is no question that the Authority has statutory *authority* to revise and upgrade the Standards, W. Va. Code § 16-2D-6, petitioners do not contend that it has a statutory *mandate* to do so, or that this Court either could or should force the Authority to act.

16

"unmet need" for services, which was calculated in the first instance, and then on review, by utilizing the methodology set forth in Section V(C) of the Standards. In this regard, the "unmet need" that the respondents calculated in Cabell, Wayne, and Preston County, 29, 55, and 44 individuals, respectively, was deemed by the Authority to be sufficient. Petitioners contended at all stages of the proceedings below, and contend on appeal in their core assignment of error,[14] that in order to establish "unmet need" a provider must establish the existence of no fewer than 229 individuals needing services. In this regard, the petitioners argue that the Authority's interpretation of the Standards, and particularly section V(C)(4) thereof, "Calculation of the Threshold (Adjustment Factor)," is "[c]learly wrong in view of the reliable, probative and substantial evidence on the whole record; or . . . [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." *W. Va. Med. Imaging*, 227 W. Va. at 440, 711 S.E.2d at 262, Syl. Pt. 1, in part. As set forth above, the Authority's consistent and longstanding interpretation of the procedures set forth in Section V(C), is that the figure of 229 individuals in need of home health care is an *adjustment* factor that comes into play only where an applicant seeks a CON in a county or counties where another provider received a CON within the preceding 12 months. The adjustment, says the Authority, is intended to give relatively new providers an opportunity to develop a client base before facing competition from brand new providers. In contrast, petitioners claim that the figure is a *threshold* factor, specifically:

---

[14] Although the petitioners break the issue down into multiple parts, which this Court will address in turn, there is really only one issue: whether the Authority's interpretation of Section V(C) of the Standards is entitled to deference. *See* text *infra*.

17

that whether or not another provider or providers received a CON within the preceding 12 months, no CON can be granted unless the unmet need in a county or counties equals or exceeds 229 individuals.

In order to address this issue, we first look at section V(C), "Determining Unmet Need for Home Health Services," as a whole. This determination, which is made for any county in which a home health care provider seeks a CON, requires an applicant to make three or four separate calculations which are set forth in four discrete subsections. Of note, however, the following language is contained in the general overview which precedes those subsections:

> Calculation 1 compares the county and state home health utilization rates.
>
> Calculation 2 determines the extent of potential home health recipients in the county to reach the state utilization level.
>
> Calculation 3 determines the extent of potential home health recipients in the county to reach the state utilization level.
>
> Calculation 4 involves *an adjustment factor for the agencies receiving Certificate of Need approval in the previous 12 months to allow for their initiation and development of home health services*. Each agency is allowed a 229-home health recipient adjustment factor for each county in the approved service area. An unmet need or threshold of at least 229 projected home health recipients must occur in the county before consideration will be given to issuing another Certificate of Need for the County.

(Emphasis added). With this overview in mind, we turn to the subsections describing the particular calculations to be made.

18

First, subsection (1), "Calculation of the Actual Total County Home Health Utilization Rate," sets forth the methodology for calculating a county's home health care utilization rate, which is expressed as a fraction: the number of persons needing home health care services per 1,000 citizens in the county. To find this rate, the number of home health care recipients in a county is divided by the county's population for the same year, then multiplied by 1,000 in order to arrive at the county's home health care utilization rate. It is undisputed that based on fiscal year 2015 population data, which was contained in the methodology utilized in the Personal Touch application, the utilization rate in Cabell County was 27.5/1000 and the utilization rate in Wayne County was 26.5/1000, while the state utilization rate was 27.8/1000.[15] It is further undisputed that based on fiscal year 2017 population data, which was contained in the methodology utilized in the United application, the utilization rate in Preston County was 23.7/1000, while the state utilization rate was 25/1000. Pursuant to substandard V(C)(1), if a county's utilization rate is above the state rate, then that is the end of the inquiry; an unmet need does not exist. If the county's utilization rate is below the state rate, then the CON applicant goes on to subsection (2). In these consolidated cases, all of the counties' utilization rates were below the state rates for the years in question.

---

[15] While the Amedisys petitioners do not contest any of the V(C)(1) – (3) calculations in terms of the mathematics, they do contest the legitimacy of utilizing fiscal year 2015 data when, according to their expert witness, fiscal year 2017 data was available at the time Personal Touch filed its application for a CON. *See* text *infra*.

Subsection (2), "Calculation of the Actual Number of Home Health Recipients Needed to Obtain the State Utilization Rate," sets forth the methodology for calculating the actual number of home health recipients needed to bring a county's utilization rate in line with the state's rate. To make the calculation: the number of home health care recipients in a county in a particular year is multiplied by the state utilization rate for that year, after which the resulting number is then divided by the county utilization rate for the year. It is undisputed that based on data from fiscal year 2015, the number of recipients needed to bring Cabell County's utilization rate into line was 2,687 and the number needed to bring Wayne County's utilization rate into line was 1,139. It is further undisputed that based on data from fiscal year 2017, the number of home health recipients needed to bring Preston County's utilization rate into line was 875.

Subsection (3), Calculation of the Actual Number of Home Health Recipients Below the State Rate," sets forth the methodology for calculating the actual number of home health recipients below the state utilization rate. To make the calculation: the number of home health care recipients in a county, set forth in subsection (1), is subtracted from the number of home health care recipients needed to bring the county's utilization rate in line with the state's rate, set forth in subsection (2). It is undisputed that in 2017, the number of recipients below the state utilization rate in Cabell County was 29 and the number below the state rate in Wayne County was 55. It is further undisputed that in 2018, the actual number of home health care recipients below the state utilization rate in Preston County was 44.

20

It is at this point in the calculation that the parties' unanimity breaks down. In order to understand their respective arguments, we will set forth subsection (4) verbatim.

> **CALCULATION OF THE THRESHOLD (ADJUSTMENT FACTOR)**
> **(This calculation is done only if there are agencies in the proposed county which received CON approval in the previous 12 months.)**
>
> **Formula a – b = c**
>
> a.    **List the current county home health recipients <u>below</u> state**
> b.    **Subtract adjustment factor for agencies receiving CON approval in previous 12 months.**
> c.    **Number <u>above</u> threshold adjustment**
>
> **Conclusion:**
> **If the threshold is at least 229 projected home health recipients, an unmet need exists.**

Petitioners contend that the key here is in both the placement and the language of the **Conclusion**. First, they argue that its un-indented position on the page sets it apart from the subsection (4) formula, and thus it is logically a conclusion to Section V(C) of the Standards, "Determining Unmet Need for Home Health Services," in its entirety, not just to subsection V(C)(4), "Calculation of the Threshold (Adjustment Factor)." Second, they argue that the preceding argument is buttressed by the use of the word "threshold" and the correlative omission of the word "adjustment" in the **Conclusion**. Therefore, petitioners sum up, regardless of the existence of non-existence of any other providers, and regardless of how long any such providers have been in business, an applicant for a CON must demonstrate that there are at least 229 individuals in the county in need of home health care services. Respondents Personal Touch, United, and the Authority counter that in the

21

overview language of Section V(C), it is specifically stated that the 229 figure is "an *adjustment* factor for the agencies receiving [CON] approval in the previous 12 months to allow for their initiation and development of home health services." (Emphasis added). Further, respondents cite the language of subsection V(C)(4), specifically, that "[t]his calculation is done *only* if there are agencies in the proposed county which received CON approval in the previous 12 months." (Emphasis added). Additionally, respondents note the unchallenged testimony of Raymona Kinneberg that if the 229 figure were interpreted to be a threshold, rather than an adjustment, 10 counties in West Virginia are so sparsely populated that a CON could never be approved for the provision of home health care services for their residents. *See supra* note 11.

Having addressed the parties' respective factual contentions in broad terms, we now turn to the petitioner's overarching, interrelated legal arguments: that the Authority's interpretation of the Standards, specifically, that the 229 figure is an adjustment factor rather than a threshold factor, is arbitrary, capricious, and clearly erroneous, and therefore not entitled to deference by this Court; and that on de novo review, this Court should find the 229 figure to be a threshold factor. In this regard, this Court has adopted the two-part test of *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), which "first ask[s] whether the Legislature has 'directly spoken to the precise [legal] question at issue.'" *Appalachian Power,* 195 W. Va. at 582, 466 S.E.2d at 433. Here, petitioners concede that because the Standards were drafted by the Authority's predecessor,

HCCRA, not by the Legislature, the first prong of the *Chevron* analysis is not applicable. We therefore turn to the second prong of *Chevron*, which asks "whether the agency's answer is based on a permissible construction of the [Standards]." *Id*. In determining that issue, we have held that "[a] valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious." *Murray Energy Corp. v. Steager*, 241 W. Va. at 632, 827 S.E.2d at 419, Syl. Pt. 6, in part. However, if it is determined that an agency's interpretation of its regulations is not entitled to *Chevron* deference, then we may interpret the regulations pursuant to our well-established rule that "'[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review.' Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995)." Syl. Pt. 2, *Steager v. Consol Energy, Inc.*, 242 W. Va. 209, 832 S.E.2d 135 (2019).

In support of both their deference and de novo review arguments,[16] petitioners contend that common sense, "whole-text analysis,"[17] the Merriam-Webster Dictionary,[18] and a grammatical analysis made by the late United States Supreme Court Justice Antonin Scalia,[19] all mandate a finding that the word "Conclusion" at the end of Section subsection V(C)(4) of the Standards, "[i]f the threshold is at least 229 projected home health

---

[16] This Court has long recognized the deference/de novo dichotomy which is present in all of the cases where the issue is an agency's interpretation of a statute it is required by law to enforce and/or a regulation it has promulgated as part of that process. *See, e.g., W. Va. Consol. Pub. Ret. Bd. v. Wood*, 233 W. Va. 222, 228, 757 S.E.2d 752, 758 (2014) ("While this Court agrees with the proposition that the [agency's] interpretation is entitled to deference, it is imperative that a reviewing court also consider the possibility . . . that the [agency's] interpretation is erroneous.").

[17] *See Weirton Med. Ctr., Inc. v. W. Va. Bd. of Med.*, 192 W. Va. 72, 75, 450 S.E.2d 661, 664 (1994) ("It is a cardinal rule of statutory construction that a statute should be construed as a whole, so as to give effect, if possible, to every word, phrase, paragraph and provision thereof, but such rule of construction should not be invoked so as to contravene the true legislative intention.'") (citation omitted).

[18] Petitioners note that there are three references in the Standards to a "threshold/adjustment" factor, and that the forward slash, or virgule, between the two words is significant because the word virgule is defined in the online version of the Merriam-Webster Dictionary as "a short oblique stroke between two words indicating whichever is appropriate may be chosen to complete the sense of the text in which they occur." Thus, according to petitioners, when the word "adjustment" is used in V(C) and V(C)(4), the word should be interpreted to mean "threshold" since that would be "appropriate . . . to complete the sense of the text[.]" Inasmuch as there is no virgule in any of the relevant provisions of V(C), we decline to follow petitioners down this linguistic rabbit hole.

[19] Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 156 (2012) ("Material within an indented subpart relates only to that subpart; material contained in un-indented text relates to all the following or preceding indented subparts.").

recipients, an unmet need exists[,]" applies to the entirety of the four-step process for determining unmet need, not just to the fourth step. This result obtains, say petitioners, because (a) none of the other subsections are followed by a "Conclusion," suggesting that the one and only "Conclusion" in Section V(C) must apply to the entire calculation; (b) the "Conclusion" is not marginally aligned with the text of subsection V(C)(4), and thus cannot be deemed to be a part of that text; and (c) the overview language of Section V(C) includes the statement that "[t]he four calculations must be completed for each county to be served," suggesting that the fourth calculation applies in every CON cases, not just in those where a CON has been issued to another provider within the past 12 months. Additionally, petitioners claim, albeit in an oblique fashion, that absent a threshold of 229 individuals to establish unmet need, the Standards would not meet the objectives set forth in West Virginia Code § 16-2D-1, particularly the "avoid[ance of] unnecessary duplication of health services."

We are unpersuaded that these scattershot arguments are sufficient to overcome the specific directive in the overview language of Section V(C) that "[c]alculation 4 involves an adjustment factor for the agencies receiving Certificate of Need approval in the previous 12 months to allow for their initiation and development of home health services[,]" and the specific directive in subsection V(C)(4) that "[t]his calculation is done *only* if there are agencies in the proposed county which received CON

25

approval in the previous 12 months." (Emphasis added).[20] We are further unpersuaded that the placement of the "Conclusion" in subsection (C)(4) in un-indented text, *see supra* note 19, has any significance. In this regard, we note that the "Calculation of the Actual Total County Home Health Utilization Rate," set forth in subsection V(C)(1) of the Standards, is set up in a manner identical to V(C)(4): following an indented six-step analysis whose purpose is to determine whether a county's home health utilization rate is below the state rate, we find the following, un-indented, line: "If yes, continue with the following. If no, an unmet need does not exist." Likewise, we are unpersuaded that petitioners' argument is supported by common sense, in light of the undisputed testimony that if an unmet need of 229 individuals were needed to support the issuance of a CON, ten counties in West Virginia would never be able to meet the 229 threshold.

In addition, the petitioners give no weight at all to the undisputed fact that for at least 20 years, the Authority has consistently interpreted the 229 figure as an adjustment factor, not a threshold factor, and accordingly has consistently interpreted subsection V(C)(4) of the Standards to apply only in cases where another provider has received a CON within the 12 months preceding a new application.[21] In this regard, we have held that

---

[20] As previously noted, because no virgule appears in these directives, we will not linger over petitioners' complex linguistic argument that its appearance elsewhere in the Standards somehow transforms the word "adjustment" into "threshold."

[21] Petitioners put on evidence to show that the Authority's predecessor, HCCRA, seemed to embrace petitioners' view while the Standards were being developed, by affixing

[i]nconsistency is only one of many circumstances that this Court should consider in determining deference. The factors most often recognized by courts as to whether to defer to administrative interpretations were set out by Colin S. Diver in *Statutory Interpretation in the Administrative State,* 133 U. Pa. L. Rev. 549, 562 n. 95 (1985). He lists them as

"(1) whether the agency construction was rendered contemporaneously with the statute's passage, ... (2) whether the agency's construction is of longstanding application, ... (3) whether the agency has maintained its position consistently (even if infrequently), ... (4) whether the public has relied on the agency's interpretation, ... (5) whether the interpretation involves a matter of 'public controversy,' ... (6) whether the interpretation is based on 'expertise' or involves a 'technical and complex' subject, ... (7) whether the agency has rulemaking authority, ... (8) whether agency action is necessary to set the statute in motion, ... (9) whether ... [the Legislature] was aware of the agency['s] interpretation and failed to repudiate it, ... and (10) whether the agency has expressly addressed the application of the statute to its proposed action[.]" (Citations omitted).

*Appalachian Power*, 195 W. Va. at 591 n.24, 466 S.E.2d at 442 n.24.

Finally, with respect to petitioners' intimation that the Authority's interpretation of the Standards allows for the unnecessary duplication of home health services in counties such as Cabell, Wayne, and Preston, we note that there is no empirical evidence in the appendix record to support such a claim. Additionally, although the Preston

to the draft Standards a sample calculation that treated 229 as a threshold figure. However, HCCRA somehow "omitted" – whether intentionally or inadvertently – putting that sample calculation into the final version of the Standards that was signed by the Governor.

27

Memorial petitioners attempted to show at the hearing before the Authority that the existence of a new home health provider in Preston County would result in some "poaching" of the Preston Memorial petitioners' existing patients, and that United's plan for providing services in Preston County was not cost-effective, the petitioners did not list these alleged errors, directly or indirectly, in an assignment of error. Therefore this Court will disregard them on appeal. *See* Rule 10(c)(3) of the West Virginia Rules of Appellate Procedure.[22]

Building on the preceding arguments, all of which analyze the language, placement, and punctuation of Section V(C) of the Standards through the lens of an English academician, petitioners next contend that in 2007, the Circuit Court of Mason County found, on facts materially similar to those in the instant consolidated cases, that the 229

---

[22] This Court recently discussed the importance of assignments of error, cautioning that

> a petitioner's presentation of an assignment of error allows a respondent to address the focused issue, confident that he did not fail to discern a determinative argument buried in petitioner's prose. This courtesy is imperative to equitable function, averting the danger that the Court and respondent may discern different issues from a petitioner's lengthy, free-flowing argument. This benefit, in turn, inures to the petitioner, ensuring that a responsive pleading does not throw the appeal into an unexpected rabbit hole.

*Wilson v. Kerr*, No. 19-0933, 2020 WL 7391150, at *3 (W. Va. Dec. 16, 2020) (memorandum decision).

figure for unmet need was a threshold that all CON applicants must meet, not just an adjustment factor to be applied where another provider had received a CON in the particular county within the past 12 months. *Pleasant Valley Hosp., Inc. v. Fam. Home Health Plus, Inc., d/b/a Ohio Valley Home Health, Inc*., No. 06-AA-20 (Cir. Ct. of Mason Cnty., Mar. 27, 2007), *appeals denied*, Nos. 073947 and 073948 (W. Va. Sup. Ct. Apr. 3, 2008). We may dispose of this argument without extended discussion. First, to the extent petitioners are trying to claim that the Mason County case has precedential value because of this Court's denial of the appeals therefrom, we have clearly held to the contrary: "This Court's rejection of a petition for appeal is not a decision on the merits precluding all future consideration of the issues raised therein[.]" Syllabus, in part, *Smith v. Hedrick*, 181 W. Va. 394, 382 S.E.2d 588 (1989). Second, petitioners have given this Court no principled basis on which to conclude that the analysis of the court in *Pleasant Valley Hospital* was any more cogent, insightful, or scholarly than the contrary analysis of the two courts in the cases below. Third, as is clear from the analysis herein, we disagree with the conclusion reached by the court in the *Pleasant Valley Hospital* case and disagree with petitioners' sweeping assertion that "the [court's] interpretation of the Home Health Standards is the only correct interpretation."

The petitioners' next argument is ostensibly about health planning and public policy considerations, but in reality is merely a compilation of online information which purports to demonstrate that there exists (a) a "precipitous expansion of services by new providers in twenty-five counties" in West Virginia, and (b) a disconnect between the

29

Authority's standard for unmet need in home health services and its standard for unmet need in other areas of health care.[23] Our examination of the voluminous appendix record submitted by the parties demonstrates that no empirical data to support these contentions was submitted to the Authority at either the Amedisys petitioners' public hearing or the Preston Memorial petitioners' public hearing, and therefore none of it was considered by either the Office of Judges or the circuit courts. Further, at oral argument respondents' counsel stated categorically that the number of home health care service providers is far fewer than existed at the time the Standards were established in 1995, in large part because of the consolidation of smaller providers into large nationwide providers such as Amedisys.

We need not resolve these factual disputes because it is a bedrock principle of appellate jurisprudence that "representations in an appellate brief do *not* constitute a part of the record on appeal." *Pearson v. Pearson*, 200 W. Va. 139, 152, 488 S.E.2d 414, 427 (1997) (Workman, J., dissenting) (citing *Wilkinson v. Bowser,* 199 W.Va. 92, 483 S.E.2d 92 (1996)). And in any event, the Legislature has delegated matters involving public health to the Authority, *see id*. § 16-2D-1 to -20, which has the institutional expertise needed to resolve difficult issues of public health and citizens' access to public health services. In this regard, we have held that this Court's review of an agency determination

---

[23] Petitioners cite to internet sources for information on the Authority's standards governing unmet need for computed tomography; cardiac surgery; hospice services; megavoltage radiation therapy; positron emission tomography; fixed magnetic resonance imaging; in-home personal care; intermediate care facilities for individuals with intellectual disabilities; and end stage renal disease.

> must be performed with conscientious awareness of its limited nature. The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise. The immersion in the evidence is designed *solely* to enable the court to determine whether the agency decision was rational and based on consideration of the relevant factors.

*Princeton Cmty. Hosp. v. State Health Plan.*, 174 W. Va. 558, 564, 328 S.E.2d 164, 171 (1985) (citation omitted); *cf. Appalachian Power*, 195 W. Va. at 582, 466 S.E.2d at 433 ("An inquiring court – even a court empowered to conduct *de novo* review – must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion."). Given the Authority's longstanding interpretation of the particular Standard at issue, Section V(C) and more specifically subsection V(C)(4), this Court will not presume to second-guess a policy which has only been challenged three times in 25 years – with only one "win" for the position espoused by the petitioners, a decision that has no precedential value since this Court denied the appeal therefrom pursuant to our prior practice.[24]

In consideration of the foregoing, we hold that where the State Health Plan Home Health Services Standards were promulgated by the West Virginia Health Care

---

[24] The current Rules of Appellate Procedure were promulgated and adopted by this Court on October 19, 2010, and were effective December 1, 2010. The Clerk's comments to Rule 21, **Memorandum decisions**, note that "[t]he ability to enter memorandum decisions – rather than refusal orders under prior practice – is at the core of the revised process: every appeal, unless dismissed, will result in a decision on the merits."

Authority (formerly the West Virginia Health Care Cost Review Authority) pursuant to a legislative grant of authority, West Virginia Code §§ 16-2D-1 to -20 (2016 & Supp. 2020), authorized by the Governor, and formally adopted and given full force and effect by the Legislature, *see id*. § 16-2D-6(g), the longstanding, consistent interpretation of those Standards by the West Virginia Health Care Authority, being neither arbitrary nor capricious, is entitled to judicial deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984).

Finally, the Amedisys petitioners contend that the Authority erred in granting a CON to Personal Touch because the data upon which the Section V(C) calculations were based was not "the most recent home health survey data" available. In this regard, Personal Touch utilized a methodology containing 2015 data, rather than utilizing 2017 data which had been collected and aggregated by the Authority from a 2018 survey and made public in or about June, 2018, prior to the date of Personal Touch's application. Petitioners' expert witness, Mr. Gibbs, testified that if the 2017 data had been utilized, the V(C) calculations would have demonstrated that the unmet need in Cabell County had actually declined to - 195. In response, the respondents point out that it is the Authority, not the applicant, which performs the unmet need calculations, and that at the time the Personal Touch application was prepared and filed, the "2015 Home Health Care Methodology" was the most current methodology available. In that regard, the Authority states in its brief that even if the raw 2017 data from the 2018 survey results was available in June, 2018, the "2017 Home Health

32

Need Methodology" was *not* available for use until December 8, 2018 – months after the Personal Touch application had been submitted.

Petitioners point to no statute, regulation, or case from this Court requiring an applicant to use available raw data rather than the data contained in the Authority's most current "Hone Health Need Methodology." Therefore, in accepting the calculations contained in the Personal Touch application, the agency cannot be said to "ha[ve] exceeded its constitutional or statutory authority or [to be] arbitrary or capricious[,]" *Murray Energy*, 241 W. Va. at 631, 827 S.E.2d at 419, Syl. Pt. 6, in part.

## IV. Conclusion

For the foregoing reasons, the decisions of the circuit court in No. 20-0308 and No. 20-0401, consolidated for purposes of this appeal, are affirmed.

Affirmed.